Argued February 13, decided March 4, rehearing denied June 3, 1913.

## DANIELS v. MORRIS.

(130 Pac. 397: 132 Pac. 958.)

**Sales—Actions for Breach—Sufficiency of Evidence.**

1. In an action for breach of a contract to grow and sell to plaintiff 20,000 pounds of prime hops, evidence *held* to show that 20,000 pounds of defendant's crop of hops were prime.

[As to the validity of sales of property not in existence, see note in 81 Am. St. Rep. 42.]

**Sales—Breach—Refusal to Accept.**

2. Under a contract to grow and sell 20,000 pounds of prime hops, which provided that the purchaser should have preference both as to quantity and quality over all other contracts made as to such growth of hops by the seller with any other purchaser, where 20,000 pounds of the seller's crop were prime, and the purchaser on an inspection of a part thereof declined them without objecting to any particular bales and without giving the seller an opportunity to supply others in place thereof, the contract was broken by the purchaser.

**Sales—Contract—Construction.**

3. Under a contract for the sale of hops, each bale to contain "from 180 to 210 pounds of hops (5 pounds tare per bale to be allowed)," bales weighing with the bale cloth 215 pounds were within the contract.

**Sales—Breach—Refusal to Accept.**

4. A recovery by the seller under a contract for the sale of hops in bales to contain from 180 to 210 pounds was not defeated by an excess of weight in a few bales, where the refusal to accept was not placed on that ground.

**Sales—Breach—Measure of Damages.**

5. Under a contract to grow and sell hops providing that the purchaser should make certain advances to the seller, and that if the purchaser should fail to accept and pay for the hops the seller should be entitled to receive as liquidated damages the difference between the contract price and the market value on a specified date, the pur-

chaser by a refusal to accept did not forfeit the advances, and the seller was only entitled to offset his liquidated damages ascertained as provided in the contract against such advances.

**Contracts—Actions—Performance by Plaintiff—Necessity.**

6. A party to an executory contract containing mutually dependent covenants, to be performed some by one party and the remainder by the other, cannot recover damages for a breach without alleging and proving, if his allegation is traversed, that he has performed his own covenants, or showing some excuse binding on the other party for not performing.

**Sales—Breach by Buyer—Remedies of Seller.**

7. Where a buyer refuses to take and pay for property sold, the seller may keep the property subject to the buyer's order after making a tender, and sue for the balance of the purchase price, or sell the goods for the best price obtainable, and sue the buyer for the difference between such price and the contract price.

**Sales—Breach by Buyer—Remedies of Seller.**

8. Where a seller of goods upon the buyer's refusal to accept sold the goods to other parties for his own account, and kept the proceeds, he could retain only so much of the purchase price advanced by the buyer as would cover the damages for the breach of the contract.

> [As to sales of property manufactured to order and manufacturer's remedies on refusal by purchaser to accept, see note in 56 Am. Dec. 642.]

From Yamhill: PERCY R. KELLY, Judge.

This is an action by C. F. Daniels and W. J. Bishop, partners in business under the firm name and style of Daniels & Bishop, against M. L. Morris and E. L. Morris. There was a judgment for plaintiffs and defendants appeal. MODIFIED.

For appellants there was a brief, with oral arguments by *Mr. Woodson T. Slater* and *Mr. Myron E. Pogue.*

For respondents there was a brief, with oral arguments by *Messrs. McCain & Vinton.*

MR. JUSTICE EAKIN delivered the opinion of the court.

On April 1, 1910, C. F. Daniels and the defendants entered into a contract by which the defendants agreed

to grow and sell to plaintiff Daniels 20,000 pounds of
prime hops, and Daniels agreed to purchase the same
at $.16 per pound; the contract in so far as involved
here being as follows:

"That said seller * * does hereby agree to sell and
deliver to the buyers * * twenty thousand (20,000)
pounds of hops. * * And to deliver the said hops in
said year at the McMinnville depot * * at such time
between the 1st and 31st days of October of said
year as the buyers may direct.   Each bale of said
hops to contain from 180 to 210 pounds of hops (five
pounds tare per bale to be allowed), and are to be
put in new bale cloth.   The said hops shall be of
prime quality of even color, well and cleanly picked,
and not broken.   And the seller further agrees that
this contract shall have preference, both as to quan-
tity and quality, over all other contracts made as to
said growth of hops by the seller with any other pur-
chaser.   The buyers agree to advance to the seller for
cultivation purposes $400.00, upon the signing of these
presents, and for picking purposes, on or about the
first day of September of said year to enable the seller
to harvest said crop of hops, and to prepare the same
for market in the manner in which the seller agrees to
harvest and prepare the same, the sum of 5 cents per
pound at their office. * * And upon the delivery and
acceptance of said hops the buyers will pay in cur-
rent funds of the United States or their equivalent
9 cents, the balance due on said hops at 16 cents per
pound, that being the agreed price for said hops, and
all money advanced for the purposes aforesaid, with
—— per cent interest to be deducted from the pur-
chase price of said hops. * * It is further agreed
that if the seller should sell said hops, or any part
thereof, in violation of the terms of this agreement to
any other person or persons or refuse to deliver the
same to the buyers, as herein agreed, or otherwise fail
to perform the terms and conditions of this contract,
to be kept and performed by him, the buyers not being

in default, in the terms and conditions to be by them kept and performed, the buyers shall be entitled to receive, in addition to all advances made and interest thereon; * * and should the buyers fail on their part to accept and pay for the hops herein agreed to be sold, the seller not being in default in the terms and conditions to be by him kept and performed, the seller shall be entitled to receive as liquidated and ascertained damages for such breach on the part of the buyers, the difference between the contract price of said hops, as herein specified, and the market value of the kind and quality in this contract mentioned at McMinnville, Yamhill County, Oregon, on the 31st day of October, 1910.''

Daniels thereafter assigned the contract to Daniels & Bishop, these plaintiffs. Defendants raised about 31,000 pounds of hops, and cured and baled them, amounting to 155 bales in all. Plaintiffs advanced to defendants under the terms of the contract, $1,576.32. On October 8th defendant had delivered in the warehouse at the depot, in McMinnville, 95 bales of hops, containing about 20,000 pounds, and that on that day defendants tendered to plaintiffs the said 95 bales, which plaintiffs examined, and pronounced the hops damp and not properly dried. When plaintiffs first declined to receive the hops, and said that they were slack dried, defendant took 21 bales thereof back to the dryer, and redried them, which resulted, to some extent, in breaking up the hops. The Morrises testified that when they opened up the bales they were found to be well dried, and further admit that about 5 bales of the last picking were out of color, and not prime hops. Witnesses who identified the classification made by them show that the objectionable hops were mostly those redried, because badly broken up, and the 5 bales of the last picking, which were not of good color. At that time plaintiffs gave defendants notice

that they would not accept the hops and demanded the repayment of the advances made.   Before October 20th, defendants delivered 21 additional bales at the warehouse, and on the 22d, that many more, making 137 bales in all; and the balance of the crop, namely, 18 bales, was deposited in the warehouse on the 27th of October.   The hops were reinspected by plaintiffs on October 20th, and again refused by them.   Prior to October the price of hops had gone down to 14 cents or less, so that at the time the hops were tendered, on October 8th, plaintiffs were anxious to be relieved from taking the hops.   They made little objection to the hops except that they were slack dried.   They did not discard any particular bales, that defendants might have them tested or replace them with good ones, but in general terms said they would not accept the hops; and they bring several other witnesses who corroborate them in their statement that many of the hops were slack dried, although some of these witnesses did not corroborate them altogether.

1. W. C. Miller, a witness for plaintiffs, took four samples from the hops, one of which represented a prime hop, two of them were medium, and one a cull, and says that the drying was all right in the medium hops; that they were well dried; and that the cull hop evidently had been redried, anyhow it was dried too much.   Weidner, a witness for plaintiffs, first had four samples furnished him by the Morrises.   Afterward he drew 10 or 12 samples himself, and he classed some of them as good prime, and except the 21 bales redried, and one other, as prime, or better than prime. He offered to buy them, but plaintiffs told him they had a lien on them, so he declined them on that account. Frank Johnson, a member of the firm of J. W. Seavey Hop Company, of Portland, was a witness called by plaintiffs, and says that he was sent samples of the

hops by the defendants, and that on October 20th he wrote a letter grading the hops, classifying samples 7–87, 121, and 124 (referring to the numbers of the bales from which samples were taken) as prime, and four samples as less than prime. Later he examined the hops himself, and graded 90 bales as prime, and 43 others as containing no slack hops. He purchased the hops, and sold 27,000 pounds of them on sample as prime. The redried hops were in bales numbered from 135 to and including 155. Evans, a witness for plaintiffs, says he took five samples, one representing the 21-bale lot (redried), one representing the 5 bales of the late picking, and three representing 129 bales, the balance of the crop, and sent them to Mischler, at Aurora. From samples sent him by Morris, witness classed three of the samples, one as representing prime hops, one broken as though redried, and the other very slack. The samples exhibited by Morris were evidently drawn from the same classes as those taken by himself, namely, from the 21 bales of redried hops, from the 5 bales of the last picking, and from the 129 bales, the balance of the crop. Therefore the sample he pronounced prime undoubtedly represented the 129 bales. In speaking of the samples he drew he says that judging by the lot he would not pronounce them prime. One of the samples he drew represented prime hops; of the other two, one was very much broken up, as though redried, the other very slack. Mischler, referring to the same samples, says the one representing the 21 bales of redried hops, of course, was broken considerably; that the five bales were a little slack; and that, of the three samples representing the 129 bales, one was prime, and the other two dried enough, but off color.

The contract calls for hops of prime quality, even color, cleanly picked, and not broken. Plaintiff Dan-

iels and other witnesses called by plaintiffs, in describing or defining hops of prime quality, say it is a hop that is cured properly, picked cleanly, dried enough so as to keep, and not overdried. They describe choice hops in practically the same terms, and, in distinguishing between prime hops and choice, they were not able to name any differential feature; but we understand from their efforts to describe them that choice hops are hops a little cleaner picked, a little better dried, without being too much dried, and of a little better color than prime hops. In other words, it depends upon the opinion of the person judging, rather than on any accurately definable conditions. If hops are fairly well dried, fairly cleanly picked, and of good color, one expert can consistently pronounce them prime, while another may pronounce them less than prime; and so also as to choice hops. Opinions differ. If a buyer is under contract to buy prime hops and wishes to avoid his contract, it is not difficult to claim the hops as less than prime and to get his friends to agree with him. If he wants the hops, he will accept them if they are approximately prime, without objection. So there is no exact line of demarcation between medium and prime hops that can be accurately defined or drawn. The outcome of these hop contracts between the hop buyers and farmers, as to either the buyer or the farmer, is almost a pure chance. There is an absence of all the means of calculating the results. The demand and price for hops are subject to sudden and extreme fluctuation without apparent reason; and, when a person makes such a contract, he cannot expect the courts to show him leniency because of its hardships when the price is adverse to him. Both parties take the chance, and should abide by the result.

If defendants' hops did not fill the contract, he has no remedy, but, if they did, plaintiff must meet the

terms of the contract; and the only question is: Did the hops met the terms of the contract? The principal ground of plaintiffs' objection made at the time of the inspection of the hops was that they were not properly dried. There were four expert witnesses besides Miller and the defendants themselves, who testify that most of the hops were properly dried. Evans' testimony is practically to the same effect, at least so far as the drying is concerned. Stout and Fletcher, witnesses for the plaintiffs, saw only samples shown them by Daniels, and there is no indication from which bales the samples were taken, nor that they were representative of the 129 bales, or any part thereof. Dorcas' examination was superficial and casual. It was not shown from what bales samples classed by Miller were taken, or that they were representative of the lot. The only fault Weidner finds was that they were of mixed color and the hops broken. His samples, therefore, must have been from the redried hops, or from the last picking.

2. We are convinced from the preponderance of the evidence that 20,000 pounds of the hops were prime. The contract provides that the plaintiff shall have preference both as to the quantity and quality over all other contracts made as to said growth of hops by the seller with any other purchaser. Thus, if there were in the 31,000 pounds of hops harvested by defendants 20,000 pounds that were prime, plaintiffs were to have the right to select them from the whole crop. The conduct of plaintiffs would not indicate a desire to select 20,000 pounds therefrom if that many were prime, but on an inspection of a part thereof declined them without objecting to any special bales, and without giving defendants an opportunity to supply others in place of the defective ones.

3, 4. Objection is now made that some of the bales weighed more than 210 pounds each. The contract provides: ''Each bale of said hops to contain from 180 to 210 pounds of hops (5 pounds tare per bale to be allowed).'' Therefore the weight of the bale with the bale cloth may be 215 pounds, and be within the contract. We may infer that the 95 bales delivered prior to October 8th were delivered in the order of their numbers, and therefore numbered from 1 to 95, as that was apparently the order in which they were baled and weighed; and of those so numbered there were but 9 that weighed over 215 pounds gross, and none exceeded 220 pounds. Daniels in his testimony says that it was claimed by Mr. Morris that there were 20,000 pounds in the 95 bales, and that that would make an average of more than 240 pounds to the bale. This is error on the part of the witness. Twenty thousand pounds in 95 bales would average just 210.5 pounds to the bale. Neither was this objection made when the hops were rejected, and the excess of weight in a few of the bales is immaterial in this case.

5. It is contended by the defendant that the plaintiffs' refusal to take the hops was an abandonment of the contract, and therefore a forfeiture of the advances made; but the damages for breach of the contract by plaintiffs is fixed by the contract, namely: ''The seller shall be entitled to receive as liquidated and ascertained damages for such breach on the part of the buyers, the difference between the contract price of said hops as herein specified, and the market value * * on the 31st day of October, 1910.'' This, we think, is intended to cover all forfeitures and damages, and that defendants must account for the advances received by them and offset the same against the damages in the contract provided for. It is difficult to determine what the market value of prime hops was on October

31st, as there were not many sales in that month. Some of the buyers testified that the market price on the 31st was 14 cents; but no sales were made or offers of that price so there is no indication that defendants could have realized 14 cents. We think the preponderance of the evidence establishes the price on October 31st at 13 cents, and we so find, making the defendants' loss $600, which deducted from the $1,576.32, plus the interest, leaves $1,001.91, for which amount, with interest from the 31st day of October at 7 per cent per annum, plaintiff is entitled to judgment and decree of foreclosure.

The decree of the Circuit Court will be modified accordingly. MODIFIED.

Decided June 3, 1913.

ON PETITION FOR REHEARING.

(132 Pac. 958.)

MR. JUSTICE BURNETT delivered the opinion of the court.

6. If that were the question here, it cannot be denied that a party to an executory contract containing mutually dependent covenants to be performed, some by one party and the remainder by the other, cannot recover damages for a breach thereof without alleging and proving, if his allegation is traversed, that he has performed his own covenants or shows some excuse binding on the other party for not performing.

7. The position assumed by the defendants in their petition for rehearing would be well enough if they had kept good their tender of the hops, so that at any time the plaintiffs could have obtained them on payment of the balance of the purchase price. When a buyer refuses to take and pay for property offered by the

seller in performance of an executory contract for the sale thereof, the latter has the choice of either of two remedies. He may keep the property on hand subject to the order of the buyer, after making tender thereof, and maintain an action for the balance of the purchase price, or he may sell the goods for the best price obtainable, and if that is less than the contract price sue the buyer for the difference.

8. In this case the defendants who are sellers have adopted the latter alternative. They claim only $800 damages for the alleged breach by the plaintiffs of the contract pleaded, and not only keep $1,576.32 advanced, but also have sold the hops for their own account, keeping the proceeds. By so doing they waive performance of the contract by the plaintiffs, and can only hold them for damages resulting from the breach of the agreement. Compensation is all that can be allowed in such instances. The defendants are entitled to be made whole, and no more. They cannot sell the hops for their own account, and also keep the money paid on the purchase price beyond enough to cover the damage they have suffered.

The result attained in the former opinion was correct, and the petition for rehearing is denied.

REHEARING DENIED.