HUGO V. LOEWI, Inc. v. GESCHWILL.

No. 12440.

United States Court of Appeals
Ninth Circuit.

Jan. 31, 1951.

Kerr & Hill, Robert M. Kerr and Stuart W. Hill, all of Portland, Or., for appellant.

Roy F. Shields, Randall B. Kester and William E. Dougherty, all of Portland, Or., for appellee.

Before MATHEWS, BONE and POPE, Circuit Judges.

BONE, Circuit Judge.

This is an action upon an alleged breach of a contract for the purchase and sale of cluster hops. Plaintiff, sometimes referred to as appellee, is Fred Geschwill, an Oregon farmer hop producer and the seller under the contract. Defendant, sometimes referred to as appellant, is Hugo V. Loewi, Inc., a New York Corporation and the buyer under the contract. This is one of three companion cases (consolidated for trial) which involve similar hop sale contracts for the year 1947 in the Willamette Valley in the State of Oregon.

The action was commenced in the Circuit Court of the State of Oregon for the County of Marion and removed to the District Court for the District of Oregon pursuant to 28 U.S.C.A. § 71, Sec. 1441 of the Revised Title 28.

All three cases were tried to the court without a jury and all resulted in a judgment for the plaintiffs (hop producers) from which all defendants appeal, the records in all the cases being consolidated on this appeal. The other two cases are: Hugo V. Loewi, Inc., v. Smith, 9 Cir., 186 F.2d 858; John I. Haas, Inc., v. Wellman, 9 Cir., 186 F.2d 862.

The contract provided that Geschwill, referred to therein as the seller, was to cultivate 20 acres of certain described real estate then planted in hops and to grow in a husband-like manner, and on ten days notice in writing bargain, sell and deliver the entire hop crop, estimated at 20,000 pounds, to the buyer f.o.b. cars or in warehouse at Mt. Angel, Oregon not later than October 31, 1947. The portions of the contract which are material on this appeal are:

### Quality

" * * * that such hops shall not be the product of the first year's planting, and not affected by spraying or mold, but shall be of prime quality, in sound condition, good color, fully matured, cleanly picked, free from damage by vermin, properly dried, cured and baled, and in good order and condition."

### Price

"The price to be paid for the hops to be delivered shall be the Grower's market price for the kind and quality of hops delivered containing eight (8%) per cent of leaves and stems and six (6%) per cent, or more, of seeds; the said Grower's market price may be selected by the Seller on any day between August 18, 1947 and October 1, 1947, both dates inclusive, and the Seller must notify the Buyer in writing of his selection on the day he selects. If the Seller does not select and notify then the Grower's market price of October 1, 1947 shall constitute the price for such hops, however, the Buyer agrees that the minimum price for the kind and quality of hops described herein and to be delivered

under the terms of this contract shall be eighty-five (85¢) cents per pound.

"It is further understood and agreed that in the event the leaf and stem content be less than eight (8%) per cent, then the minimum price, or the market price as selected and agreed upon, will be increased one (1¢) cent per pound for each one (1%) per cent reduction in leaf and stem content below eight (8%) per cent; and in the event the leaf and stem content exceeds eight (8%) per cent, then the minimum price, or the market price as selected and agreed upon, will be reduced one (1¢) cent per pound for each one (1%) per cent increase of leaf and stem content to and including ten (10%) per cent.

"The determination of the leaf and stem content, as aforesaid, shall be on the basis of an analysis made by the Oregon State Department of Agriculture, or by an authorized governmental agency.

"It is also understood and agreed that in the event the hops covered by this contract contain over three (3%) per cent and under six (6%) per cent seed content, then the minimum price or the market price as selected and agreed upon, will be increased five (5¢) cents per pound; and in event the seed content be less than three (3%) per cent, then the minimum price, or the market price as selected and agreed upon, will be increased ten (10¢) cents per pound.

"The determination of the seed content, as aforesaid, shall be on the basis of an analysis made by the Oregon State Department of Agriculture, or by an authorized governmental agency."

### Picking Advance

"In order to enable the seller to produce and harvest said crop and put the same in the condition herein agreed, the buyer will advance and loan to the seller such sums of money as may be required by the seller to defray the necessary expenses of cultivating and picking such hops, and of harvesting and curing the same and for such purposes only, not to exceed, however, twenty (20¢) cents for each pound of hops herein bargained and sold and which may be grown on said lands, such advances to bear interest at the rate of no per cent per annum. Said advances to be paid in the following manner:

"20 cents per pound or $4,000.00 on or about September 1, 1947 provided, such sums are actually required for the cultivation, picking, drying and baling of said hops, and that, if before, at, or during the time of picking such hops, they are not in such condition so as to produce the quality of hops called for under the terms of this agreement, then in such event, the buyer shall be discharged from any obligation to make any advances or further advances, and from the obligation to receive the whole or part of said hops; and that this instrument shall then stand and be in force as a chattel mortgage upon the whole of said hop crop for any advances which shall have been made, or may be made, and interest thereon."

### Measure of Damages

"The parties hereto further agree that upon the breach of the terms of this contract by either party, the difference between the contract price of said hops and the market value thereof at the time and place of delivery shall be considered and is hereby agreed to be the measure of damages, which may be recovered by the party not in default for such breach, and the said difference between the said contract price and the market value thereof is hereby agreed and fixed and determined as liquidated damages."

A brief sketch of background facts out of which this litigation arose will be helpful. Sometime during the growing season of 1947 the hop fields in the Willamette Valley suffered an attack of mildew due apparently to damp and rainy weather. Growers and buyers alike were concerned and there was a general belief that the amount of hops harvested would not fill the market demands. Several Eastern buyers came to the Valley to survey the possible extent of the damage, among them the President of appellant, Mr. Oppenheim. Oppenheim felt that the market would be short and directed his Oregon representative to buy more hops. A short time after the Oppenheim visit negotiations were

carried on between appellee and the broker representing appellant regarding the purchase of appellee's fuggle and cluster hops.[1] An agreement was reached on August 17, 1947, and the contract was signed the next day, and, at that time a "picking advance" was made as provided in the agreement. Shortly thereafter the cluster hops were picked and in due course delivered to Schwab's warehouse in Mt. Angel, Oregon. Two type samples of the cluster hops were forwarded to appellant's New York office.

On September 25, 1947 appellant advised Paulus, its Oregon broker, to reject the clusters. This decision was made on the basis of the two samples forwarded to New York. Subsequently, on October 20th, an inspection was conducted by Fry an inspector employed by Paulus. "Tryings" were taken from each bale and tenth bale samples were also taken. The hops were weighed, numbered and weight slips prepared. Appellee at the request of Fry signed a "paper" which in substance provided that weighing in would not constitute an acceptance. The new samples were forwarded to New York. The New York office then replied that the hops were "blighted" but that three of the samples were better than the others and that appellant was willing to accept hops equal to these samples. Appellee and Paulus examined these three samples and concluded that they were not materially different than the others.

A formal letter of rejection was mailed to appellee on October 30th and the contract was recorded by appellant as a chattel mortgage on October 31st. The hops were not sold by appellee until after this action was commenced (March, 1948) at which time a resale was permitted by stipulation of the parties.

The district court found, in substance, that appellee had done all that was required of him under the contract and had put the hops in a deliverable state; that the hops were identified and appropriated to the contract; that the contract price as determined from the agreement was 95 cents per pound or a total of $25,209.20; that appellant rejected the hops because they were blighted, and under the facts, such defect was not material; that the hops were merchantable and were substantially of the average quality of Oregon cluster hops actually accepted in 1947 by the hop trade generally and by appellant under contracts containing the same type quality provisions; that hops are of a perishable nature and that there was a general decline in the market price and the hops could not readily be resold.

The court further found that the resale of the hops by appellee was proper and that appellee was entitled to judgment for the amount due on the contract less the amount realized from the resale of the hops. The court gave judgment for appellee in the amount of $15,666.18 with interest at the rate of six per cent per annum from April 16, 1948, until paid. This appeal followed.

At the outset we would like to make this observation. The terms of the contract between the parties classify it as a so called "futures contract." However, in the instant case it was employed to purchase a crop already in existence and ready to be picked. We believe this factor to be significant and entitled to consideration in construing this contract.[2]

Appellant's brief sets forth 25 specifications of error. Many of the alleged errors must stand or fall on a determination of whether or not the particular hops are of the quality called for by the contract. The case really resolves itself into two main and decisive issues: (1) Is there substantial evidence to support the finding by the trial court that the hops were of the

1. There is no controversy between the parties in regard to the fuggle hops.

2. Section 2-218, O.C.L.A. provides: "For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the judge be placed in the position of those whose language he is to interpret." O.C.L.A. is a reference to Oregon Compiled Laws Annotated.

quality called for by the agreement? and (2) if so, what is the proper measure of the appellee's damages? We confine this opinion to a discussion of these two questions and the related questions of law arising under each.

## Issue on Quality

That portion of the contract which specifies the quality of the hops is as follows: " * * * such hops shall not be the product of the first year's planting, and not affected by spraying or mold, but shall be of prime quality, in sound condition, good color, fully matured, cleanly picked, free from damage by vermin, properly dried, cured and baled, and in good order and condition."

A great deal of discussion in the briefs is devoted to the meaning of the phrase "prime quality." Appellant asserts that "prime quality" means exactly what the rest of the warranty specifies, that is, hops which are not the product of the first year's planting, and not affected by spraying or mold, but which are in sound condition, of good color, fully matured, cleanly picked, free from damage by vermin, properly dried, cured and baled and in good order and condition.

■ On the other hand appellee asserts that there is no exact meaning to the phrase "prime quality." As we understand his position hops are prime quality if they are good merchantable hops, equal to the average quality accepted in the trade that year under "prime quality" contracts. It is urged by appellant that such a meaning would force the buyer to accept average hops even though they are badly damaged. Such is not the case. The import of the court's finding, when viewed in its context, is that what the parties do in relation to a particular provision in a contract is an

important consideration in determining its meaning.[3]

The proposition that "prime quality" has no definite meaning has been advanced by the Oregon Court. In Daniels v. Morris, 65 Or. 289, 130 P. 397, 132 P. 958, the court said at page 399:

"The contract calls for hops of prime quality, even color, cleanly picked, and not broken. Plaintiff Daniels and other witnesses called by plaintiffs, in describing or defining hops of prime quality, say it is a hop that is cured properly, picked cleanly, dried enough so as to keep, and not overdried. They describe choice hops in practically the same terms, and, in distinguishing between prime hops and choice, they were not able to name any differential feature; but we understand from their efforts to describe them that choice hops are hops a little cleaner picked, a little better dried, without being too much dried, and of a little better color than prime hops. In other words, it depends upon the opinion of the person judging, rather than on any accurately definable conditions. If hops are fairly well dried, fairly cleanly picked, and of good color, one expert can consistently pronounce them prime while another may pronounce them less than prime; and so also as to choice hops. Opinions differ. If a buyer is under contract to buy prime hops and wishes to avoid his contract, it is not difficult to claim the hops as less than prime and to get his friends to agree with him. If he wants the hops, he will accept them if they are approximately prime, without objection. So there is no exact line of demarcation between medium and prime hops that can be accurately defined or drawn. The outcome of these hop contracts between the hop buyers and farmers, as to either the buyer or the farmer, is almost a pure chance. There is an absence of all the means of cal-

3. In appellant's brief it is asserted that evidence of collateral transactions is not relevant when offered to establish the terms of a contract between the parties or that it was breached by one of them, for the reason that the rights of the parties can not be affected or concluded by such collateral transactions. While this may be true as a general proposition

of law no such purpose was served here. There is a dispute between the parties as to the meaning of "prime quality", and under Oregon law it is permissible to establish the meaning of these terms by custom and usage in the trade. Sec. 2–219, O.C.L.A., Hurst v. W. J. Lake & Co., 141 Or. 306, 16 P.2d 627, 89 A.L.R. 1222, and note p. 1228.

culating the results. The demand and price for hops are subject to sudden and extreme fluctuations without apparent reason; and, when a person makes such a contract, he cannot expect the courts to show him leniency because of its hardships when the price is adverse to him. Both parties take the chance, and should abide by the result."

A specific objection made and urged most strenuously by appellant throughout the trial is that the hops were blighted. We quote from the testimony of Oppenheim, its president. In speaking of samples of appellee's hops he said:

"His samples showed some sound hops greenish in color and probably, if they had been entirely free of blight, they would have been a good, prime hop; they were not as badly blighted or as red as some other hops which I had seen some other samples of, Oregon hops."

At another point Oppenheim explained what he meant by "blighted hops":

"Q. Whatever factors you employed in deciding to reject the hops. A. Well, the samples I think speak for themselves. They contained a great many blighted hops, so-called nubbins or cones that were damaged by downy mildew, and, as I stated yesterday, I do not consider any hops prime that are diseased and blighted with downy mildew."

On this point the narrow issue confronting this court is whether there is substantial evidence to support the trial court's finding that the mildew damage or blight was not material. The evidence is conflicting. Appellant's evidence tended to show that the mildew damage was serious and that the hops could not be sold to breweries on existing contracts. Appellee's evidence was to the effect that while there was some mildew in the hops it did not affect the quality of the hops. There is testimony of the brewmaster that the hops would be acceptable to breweries. This is supported by evidence that the bulk of hops grown in the Willamette Valley in 1947 contained some mildew and nevertheless were accepted and sold to breweries. There is other testimony to the effect that

appellee's hops were prime hops, good hops, and good merchantable hops.

We are of the opinion that the finding by the trial court that the mildew damage or blight was not material is supported by substantial evidence. Numerous witnesses including many experts testified at the trial on the issue of quality. The trial judge had the advantage of seeing and hearing these witnesses. We cannot say from our review of the record that his finding on this issue is clearly erroneous or that we are left with a definite and firm conviction that a mistake has been committed.

In Otto Seidenberg, Inc., v. Tautfest, 155 Or. 420, 64 P.2d 534, 536, the court said: "The reason plaintiff [hop buyer] really asserts for the rejection of the hops is that they do not conform to the quality specified in the contracts. This question presented an issue of fact. It would require many pages of the reports to set forth the testimony of the various hop experts relative to this phase of the case. The record discloses that judging the quality of hops is not an exact science. Some of the experts on behalf of plaintiff [hop buyer] testified that a certain sample of hops was of 'prime quality,' whereas on the following day the same expert declared the identical sample 'not prime.' Many experienced growers of hops testified, in effect, that the hops met the standard of quality provided in the contracts. The trial judge who saw and heard the witnesses testify, found with the grower on the question of quality. After examination of the record, we have no hesitancy in concurring in such findings."

We think this language is particularly applicable to the instant case.

### Measure of Damages

A more serious question is presented by the measure of damages which the trial court adopted. The court granted appellee a recovery of the difference between the contract price and the amount realized in appellee's resale of the hops. Appellant contends first, that title did not pass and that appellee is limited to the difference

between the contract price and the market price at the time set for delivery this by virtue of the Uniform Sales Act of Oregon, O.C.L.A. § 71–101 et seq.; and second, that in any event appellee is limited to this method of recovery by the terms of the contract.

■ We are of the opinion that the Oregon Uniform Sales Act does not preclude the method of recovery adopted by the trial court.[4] The court found that there had been a material decline in the market price and in the demand for 1947 Oregon cluster hops; and the hops here involved could not readily be resold. There is credible evidence in the record to support this finding. While there may not have been an immediate drop in the price of hops there is evidence that the market was slow due perhaps to grain restrictions or to the fact that the crop was larger than anticipated and that all buyers' needs were filled. Quoting a price does not establish market value as that term is used if other factors show that in fact there was no available market. Cf. Buyer v. Mercury Technical Cloth & Felt Corp., 301 N.Y. 74, 92 N.E.2d 896. There is evidence that at the time of trial several thousand bales of 1947 Oregon cluster hops were still in the hands of growers. Appellee appears to have made every reasonable effort to market the hops and while his difficulty in doing so could have been due to poor quality the trial court found otherwise. Moreover the publicly recorded chattel mortgage and the fact that the hops had been rejected tended to restrict the possibility of a ready resale.

We now turn to the Oregon Uniform Sales Act. Section 71–164, O.C.L.A. provides:

"(1) Where the buyer wrongfully neglects or refuses to accept and pay for the goods, the seller may maintain an action against him for damages for nonacceptance.

"(2) The measure of damages is the estimated loss directly and naturally resulting, in the ordinary course of events, from the buyer's breach of contract.

"(3) Where there is an available market for the goods in question, the measure of damages is, in the absence of special circumstances showing proximate damage of a greater amount, the difference between the contract price and the market or current price at the time or times when the goods ought to have been accepted, or, if no time was fixed for acceptance, then at the time of the refusal to accept."

Subdivision (3) of the above law is applicable only when there is an available market for the goods in question while subdivision (2) is applicable where there is no available market.[5] Under the facts of the instant case as found by the trial court we hold that subsection (2) is the proper measure of damages and that the difference between the contract price and the amount realized by appellee from the resale of the hops represented appellee's loss directly and naturally due to and resulting from the buyer's breach of contract. This form of recovery has been allowed by the Oregon cases.[6]

We quote from Williston on Sales, (Rev. Ed.) Vol. 3, Sec. 582: "Where a buyer of goods under an executory agreement breaks his contract by refusing to accept the title to goods which are in existence, and either the local law does not allow the virtual specific performance previously discussed, (citing cases) or the seller does not wish that relief, it is to be observed that if the buyer had accepted and paid for the goods as he was bound to do by his contract, the seller would have been obliged to surrender the ownership of

4. Appellant contends that the trial court erred in finding that title to the hops passed to the appellant and therefore an action for the price may not be maintained. In the text of our opinion we assume, without deciding, that title did not pass.

5. Farish Co. v. Madison Distributing Co., Inc., 2 Cir., 37 F.2d 455.

6. Daniels v. Morris, 65 Or. 289, 130 P. 397, 132 P. 958; Lake County Pine Lumber Co. v. Underwood Lumber Co., 140 Or. 19, 12 P.2d 324; Krebs Hop Co. v. Livesley, 59 Or. 574, 114 P. 944, 118 P. 165; Call v. Linn, 112 Or. 1, 228 P. 127.

them, and to incur all the expense of delivering them at the time and place agreed on; and he would on the other hand have received the price or become entitled to it. The buyer's wrong leaves him still owner of the goods and frees him from any expense of delivering them, and, on the other hand, deprives him of the price. His loss, then, save in exceptional cases discussed in the following sections, is the difference between the value of the goods and the price which he was to receive for them; and if he is saved any expense by not being obliged to put the goods in deliverable condition or to transport them to a particular place, this also must be taken into account. But the essential element of damage is conveniently expressed by the formula—the difference between the contract price, that is, the amount of the obligation which the buyer failed to fulfil, and the market price, that is, the value of the goods which the seller has left upon his hands. *The test of market value, however, 'may be discarded and other more accurate means resorted to, if for special reasons, it is not exact or otherwise applicable.' "* (Emphasis supplied.)

In an annotation in 108 A.L.R., page 1482 entitled "Measure of Damages for Buyers Repudiation of or Failure to Accept Goods Under Executory Contract," there appears the following language at page 1487: "Of course, the circumstances may be such that it is impossible or impractical to apply the rule allowing the seller the difference between the contract price and the market price at the time and place of delivery. This is true where the goods have no market value, or where the rule, if applied, would work serious injustice. In such cases the rule is generally disregarded, the courts holding that, as a measure of damages, it is of value only so far as it puts the parties in the position they would have been in if the contract had been carried out, and that, where it does not lead to this result, other criteria must be employed."

■ The above discussion in the text books indicates that the rule of damages which allows the difference between the market price and the contract price is not a hard and fast rule but may be varied if the circumstances require it. Such variation from the normal rule is contemplated by subsection (2) of section 71–164 O.C.L.A.

We have found no Oregon cases interpreting this section of the statute. However, Stevenson v. Puget Sound Vegetable Growers' Ass'n, 172 Wash. 196, 19 P.2d 925, 926 is a case in point. In that case there was a contract for the sale of all the peas of the grower to the buyer. The buyer failed to furnish containers and the peas could not be harvested but died on the vines. The buyer contended that there was no evidence to show the difference between the contract price and the market price. Relying on a comparable section of the Uniform Sales Act which we are applying here, the Washington court rejected this contention, saying:

"Our cases * * * merely announce the general rule that a seller is entitled to recover in an amount equal to the difference between the contract price and the market price of the goods which the buyer refused to accept. This contention by appellant disregards the plain terms of the contract it entered into, prohibiting respondent from selling or otherwise disposing of any of the peas grown upon the eight acres by respondent to any other buyer than appellant which it bought at an agreed price. * * *

"This cause of action is governed by subdivision 2 of the statute above quoted and also by the fact that there was no available market for the goods in question other than that of appellant, whose contract withheld the sale of the peas by respondent to any other person".

■ The above cited Washington case is in many respects similar to the case before us. Appellee herein did not have the right to sell the hops to any one other than

appellant.[7] Further, there was no available market for the hops in that they could not readily be resold. While the case above noted is not an Oregon case, the decision therein rests on the identical section of the Uniform Sales Act which we are construing and applying here, and it was the purpose of the Uniform Sales Act to achieve uniformity throughout all the states.[8] The Oregon courts had allowed this form of recovery prior to adoption of the Uniform Sales Act by Oregon and have restated this rule since that Act took effect.[9] We place our decision squarely on the finding that there was no available market for the goods in question, that subsection two of section 71–164, O.C.L.A. applies, and that the damages are to be measured by the loss directly and naturally resulting in the ordinary course of events from the buyer's breach of contract.

### Liquidated Damages

Appellant contends that in any event the recovery is limited by the terms of the contract as to the measure of damages. That provision of the contract provides as follows: " * * * The parties hereto further agree that upon the breach of the terms of this contract by either party, the difference between the contract price of said hops and the market value thereof at the time and place of delivery shall be considered and is hereby agreed to be the measure of damages, which may be recovered by the party not in default for such breach, and the said difference between the said contract price and the market value thereof is hereby agreed and fixed and determined as liquidated damages."

It is the position of appellant that while this is not strictly a liquidated damage clause as that term is used it nevertheless limits the liability of the parties and precludes all but one measure of damages; that the Uniform Sales Act recognizes the right of the parties to modify the rights and liabilities created by that Act.

■ We are in accord with the proposition that the parties to a contract may agree in advance to limit their liability in the event of a breach. Such agreements have been enforced where the parties have attempted to arrive at a reasonable measure of damages in a field where damages would otherwise be very uncertain and difficult to determine.[10] In construing this clause we must consider it in relation to the entire contract between the parties and thus viewed it does not in our opinion prevent the recovery granted by the trial court. The contract is lengthy and contains many provisions which afford protection to the buyer in event the seller does not fulfill his part of the agreement.[11] There is nothing in the facts to indicate that it would be difficult to determine the damages of appellee by the normal rule of damages; for that matter the clause in question is itself one of the normal rules for breach of contract. On the contrary the effect of the clause is to limit recovery to one particular method (based on market value) which, under the facts, would make it more difficult to determine damages. We are aware of no reason why we should thus limit the method of recovery of damages where more definite and reasonable criteria are available.

7. Part I of the contract provided for the sale of the entire crop grown on a specified farm to appellant. Part II provided that title shall vest in the buyer on "notice to deliver and tender of the price." Part VI provided that the buyer shall have a chattel mortgage for advances.

8. Section 71–174, O.C.L.A.

9. See note 6, supra.

10. Hull v. Angus, 60 Or. 95, 118 P. 284.

11. Part II of the contract provided that upon giving notice to deliver and tendering the purchase price to the seller the buyer shall acquire title, ownership and the right to immediate possession of the hops. Part VIII provided that the seller shall not assign the contract or encumber or lease the land or in any way jeopardize or interfere with the delivery of the hops and for the breach thereof gives the seller the right to any and all damages. It cannot be said that the "liquidated damage clause" would be applicable to all the various ways in which the contract might be breached.

The so-called "liquidated damages" clause provides only one method of recovery regardless of how or when the contract is breached. This carries the implication that the parties contemplated that there would be an available market for the hops. This contemplation left no room for the situation here presented where (as found by the trial court) there was no readily available market for appellee's hops.

As a matter of fact appellant had recorded the contract as a chattel mortgage and appellee directs our attention to an Oregon statute which prevents the sale of personal property by a mortgagor without the written consent of the mortgagee.[12] Such consent was not given until after this action was commenced and it then came in the stipulation. At the time appellant decided to reject the hops it did not consent to their resale. In our view it would be unconscionable to restrict appellee to a measure of damages based on market value where under the situation he faced due to this rejection he could not dispose of the hops without appellant's consent which came only after he had been compelled to bring suit.

We have not overlooked the case of Daniels v. Morris, 65 Or. 289, 130 P. 397, 132 P. 958 on which appellant relies. The facts of that case show that the buyer sued to recover advances made. The seller (grower) had resold the hops and contended that he should also keep the advances because of the buyer's breach. The court allowed the buyer to recover and limited the seller to an amount that would make him whole, citing the liquidated damage clause. A fair reading of that case establishes that the court was interested in arriving at a just compensation. The fact situation before us is entirely different and it is our view that the result reached by the trial court is not out of harmony with the doctrine of the Morris case.

 Viewing the contract as a whole, the circumstances under which it was executed, and the circumstances under which it was breached, we are of the opinion that the measure of damages set out by the contract is not the *exclusive* remedy available to the seller. In short, where as here, there was no available market for the goods in question and such a market was obviously contemplated by the parties by the terms of the damage clause, the clause did not stand as a bar to the measure and theory of damages here adopted by the trial court which worked out substantial justice between the parties.

We have examined the record thoroughly and have discovered no reversible error in the trial court's findings of fact or conclusions of law. We have also examined all of appellant's specifications of error not embraced within the two main issues discussed above and find them to be without merit.

The judgment of the district court is affirmed.