**JOHN I. HAAS, Inc. v. WELLMAN.**

No. 12442.

United States Court of Appeals
Ninth Circuit.

Jan. 31, 1951.

5. See discussion of this issue in Hugo V. Loewi, Inc. v. Geschwill, 9 Cir., 186 F.2d 849.

————◆————

Kerr & Hill, Robert M. Kerr, and Stuart W. Hill, Portland, Or., for appellant.

Roy F. Shields, Randall B. Kester and William E. Dougherty, all of Portland, Or., for appellee.

Before MATHEWS, BONE and POPE, Circuit Judges.

BONE, Circuit Judge.

This is the third of a series of three cases that were tried jointly in the court below without a jury and are before us on appeal. The other two cases are Hugo V. Loewi, Inc., v. Geschwill, 9 Cir., 186 F.2d 849 and Hugo V. Loewi Inc., v. Smith, 9 Cir., 186 F.2d 858. The parties involved in this action are John I. Haas, Inc., defendant-appellant, who was the hop buyer and O. L. Wellman, plaintiff-appellee who was the hop grower.

The contract in the instant case was negotiated in 1944 for hops to be grown and delivered in the year 1947. It covered, and was a commitment for, one-half of the salable crop of appellee's cluster and fuggle hops, the other half having been sold to another buyer. As in the other two cases the dispute relates only to the cluster hops and not to the fuggles. The contract between the parties is in many respects similar to that in the other two cases. The differences which are material to the issues before us will be noted in the course of our opinion.

Appellee's hop yard, like most of the hop yards in the Willamette Valley, Oregon, suffered an attack of mildew some time during the growing season of 1947. Noakes, manager of A. J. Ray & Son (appellant's representative) visited appellee's yard on August 26, 1947. The harvest of the fuggle hops was just about completed but the harvesting of the cluster hops had not yet begun. Noakes testified that at that time he saw considerable mildew all through the yard, but that there were small sections reasonably free from infection. On September 6th Noakes made a "picking advance" to appellee. The amount so advanced was one-half of the amount called for by the contract as it was expected that the crop would be smaller than agreed upon. The hops were subsequently picked and delivered to Schwab's warehouse in Mt. Angel, Oregon.

Under the contract the grower (orally) selected a permissible "grower's market price" of 85 cents per pound, this under agreement with Noakes, appellant's agent and the man who had negotiated the contract with appellee. (The court found that this market price was orally selected by appellee and communicated to appellant in a manner and at a time which was acceptable to appellant and which conformed to the prior practice of the parties. The contract called for notice of such selection to be in writing. See comment on this point infra.)

On September 25th the bales were inspected and "tryings" and "tenth bale samples" were taken. The tenth bale samples were forwarded to appellant's Eastern office in Washington, D. C. Previous to the inspection of the 25th, one or two type samples had been sent to appellant in Washington, D. C. Just when appellant rejected the hops is a matter in dispute. The purchase contract was recorded as a chattel mortgage under Oregon law. The hops were resold by appellee in the spring of 1948 for a figure considerably below the contract price.

The substance of the trial court's findings is that appellee duly raised, harvested, cured and baled the hops and delivered the same to the warehouse; that appellee caused one-half of the crop to be segregated in a manner acceptable to appellant and in accordance with prior practice; that one-half of the crop was received, inspected, sampled,

marked and weighed by appellant and was identified, appropriated to the contract and set aside; that appellee duly performed all the terms of the contract by him to be performed.

The court further found that at the time the contract was entered into there was a custom in the hop trade in Oregon, which was known to the parties hereto, that such "weighing in" following an inspection constituted an acceptance; that appellee did not waive such custom; that appellant in fact accepted one-half of the 1947 crop and became obligated for the price; that there was no federal price regulation at the time and appellee selected (as above indicated) the then "grower's market price" in a manner acceptable to appellant.

The court also found that the leaf and stem content was 11%, or 3% over the average recognized in the Oregon hop trade; that according to the general custom and usage of the Oregon trade that year such leaf and stem content was compensated and the grower's market price computed by deducting one cent per pound for each one per cent of the leaf and stem content in excess of eight per cent; that the deduction in the contract should be three cents per pound resulting in a price of 82 cents per pound for the hops.

The court further found that appellee tendered the hops to appellant and was at all times willing to give complete possession to appellant; that appellant failed to pay the purchase price and knew it could obtain the hops by payment of the purchase price; that appellant did not reject the hops but advised appellee it did not wish to take the hops; that no specific objection was made at this time; that later upon the trial appellant advanced two specific objections to the hops, to wit: that the hops showed some mildew and were above average in leaf and stem content; that under the facts neither claimed defect was material; that the parties negotiated with respect to the disposition of the hops until about May 3, 1948, when appellant finally renounced all liability on the contract.

The court also found that appellee delivered the very hops that appellant contracted to buy; that said hops were of substantially the average quality of such Oregon late cluster hops actually accepted in 1947 by both the hop trade generally and by appellant under contracts containing in effect the same quality provisions; that appellant did not rely on any warranty, whether contained in the contract or otherwise, that said hops would be in any different condition or quality than said hops actually were when tendered or delivered. There were further findings that hops are of a perishable nature; there was a material decline in the general market price and demand for 1947 Oregon late cluster hops; and the hops here involved could not readily be resold; that on May 7, 1948, after appellant had been in default in the payment of said price an unreasonable time, appellee, after notice to appellant, sold the hops to another buyer for $11,904.31, the best price then obtainable.

The court concluded that the measure of recovery under Oregon law is the difference between the amount due on the contract and the amount realized by appellee from the resale. On this basis the court awarded appellee judgment for $19,915.10 with interest from May 7, 1948 until paid in full and with costs and disbursements. This appeal followed.

The case presents the same two main issues present in the other two cases: (1) quality of the hops and (2) the proper measure of damages. The instant case presents some questions not present in the other two cases and these will be dealt with in the course of this opinion.

### Issue on Quality

Two specific objections to the quality of the hops are that they were "mildewed" and "dirty picked," the last contention referring to the leaf and stem content. In regard to the question of mildew it is established that there was some mildew in the hops. Appellant contends that the mildew damage was serious and its witnesses so testified. Appellee, while admitting some mildew in the hops, claims it did not affect the quality of the hops, and appellee's showing indicated that such hops were actually accepted as prime quality hops and that they had a good flavor and were well filled with lupulin— that being the part of the hop which is the

important factor to the breweries in the making of beer, this because lupulin gives beer its characteristic flavor and aroma.

In the Geschwill case there was an abundance of testimony as to the meaning of the term prime quality. In that case we said that the phrase had no standard meaning and were interested only in whether the hops were deficient in some particular respect. In the instant case expert witnesses testified for both parties and their testimony is conflicting. Appellee and an officer for appellant testified and their testimony is likewise conflicting. While we express no opinion on what view of this conflicting evidence we might take we cannot say that the finding of the trial court is clearly erroneous.

There is also a contention that the hops were "dirty picked," and hence did not conform to the quality provisions of the contract. The official analysis of the hops placed the leaf and stem content at 11%. The average leaf and stem content for Oregon hops in the year 1947 was 8%. The contract in the instant case, unlike that in the two previous cases, contained no sliding scale provision in regard to the leaf and stem content. The trial court found that there was a *custom* in the Oregon hop trade of deducting one cent per pound for each one per cent of leaf and stem content over the average of eight per cent, which in the present case reduced the price of the hops three cents per pound. Appellant attacks this finding in two respects: (1) that the *custom* was not proved by two witnesses as required by Oregon law;[1] (2) that the custom when applied to this contract contradicts the terms thereof.

With respect to the first question there arose during the argument of this case a question as to whether the Oregon statute requiring two witnesses is procedural and not applicable in a Federal Court, or whether it is a matter of substance which

the Federal Court is bound to apply under the doctrine of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. From our review of the record we are satisfied that the custom was sufficiently established by the testimony of at least two witnesses and therefore it is unnecessary to decide this question.[2]

On the second point appellant contends that the custom was only to allow a premium of one cent per pound when the leaf and stem content was *under* the average of eight per cent; that when the leaf and stem content was *over* eight per cent the hops were "dirty picked" and hence not in conformity with the quality provisions of the contract. We think the record shows otherwise. The sliding scale provision as it appears in the contracts in the other two cases before us allows both a premium and a discount. The custom apparently originated when the O. P. A. was in effect and continued thereafter. There is testimony that the custom under O. P. A. was to allow a discount as well as a premium.

Nor does the custom conflict with the terms of the contract. Appellant relies on the case of Port Investment Co. v. Oregon Mutual Fire Ins. Co., 163 Or. 1, 94 P. 2d 734, 124 A.L.R. 1342. In that case the plaintiff contended that as an agent for fire insurance companies he was entitled on termination of the agency to the exclusive right to "policy expiration information" based on a custom entitling fire insurance agencies to such a right. The court noted that such a custom was due to the fact that such agents secured business primarily for the agency and placed it with one of several different companies. In this particular case the contract between the agency and the principal required the agent to use his best efforts to secure business for the principal and to place no business with other companies which could be placed advantageously with the principal. To apply such a custom the court held would over-

---

1. Sec. 2–902, O.C.L.A., Oregon Compiled Laws, Annotated.

2. This same objection of lack of the necessary two witnesses as required by Oregon law is raised in regard to the custom of "weighing in" constituting an accept-

ance of the hops. This custom is treated in a later part of this opinion. However, for the same reasons stated here, we make no determination of whether state or federal law is applicable as to the manner of proof of such a custom.

ride the manifest intention of the parties even though the contract was ambiguous in that it made no disposition of the "expirations." The court said, 94 P.2d at page 741: "It is ordinarily stated that a custom or usage inconsistent with the plain and unambiguous terms of a contract cannot be interposed to contradict or qualify its provisions. [Citing cases.] But it is also the law that even where a contract is indistinct and uncertain in its terms it cannot be contradicted by usage. [Citing cases.] It is sufficient ground for rejecting the custom that it is excluded by necessary implication."

Applying this principle to the instant case we are of the opinion that the custom is *excluded* neither by the terms of the contract nor by necessary implication. To so hold would be to say that the terms "well and cleanly picked" as used in the contract mean 8% leaf and stem content and no more. But the 8% figure does not appear in the contract and is itself only an average set by those experienced in the Oregon hop industry. On the contrary we are of the opinion that the custom found by the trial court to exist is an essential feature of the "grower's market price" as that term is used in the hop trade. In other words the "grower's market price" for the year 1947 was 85 cents per pound for cluster hops with 8 per cent leaf and stem content. If the leaf and stem content was higher, there was a corresponding reduction of one per cent per pound for each per cent over eight—and vice versa. Ray, one of appellant's witnesses testified as follows: "All contracts had sliding-scale price provisions, in one manner or another. Some contracts were written before the sliding-scale provisions were in vogue, before they were used, but the majority of these contracts were what we call open end or market-price contracts, and where it was established that the market was 85 cents, or a

certain price, on the sliding scale, why, then, that sliding scale became applicable to the contract, *even though it was not mentioned in the contract."* (Emphasis supplied.)

Obviously the leaf and stem content might be so high that the sliding scale could not be applied and the hops would not be of the quality called for. Where that point may be need not concern us here. We are satisfied that the finding by the trial judge that a leaf and stem content of 11% is not a material defect is supported by substantial evidence, and that the custom was properly applied to the contract.

The trial court found that at the time the contract was entered into, and at the time of delivery and "weighing in" of the hops it was an established usage and custom in the hop trade in Oregon which was known to the parties hereto, that such "weighing in" by the buyer following an inspection constituted an acceptance of such hops; and that the parties did not agree on any change or any deviation from, and appellee did not waive, such custom.

Appellant's main contention in regard to this finding is that such a custom is inapplicable by reason of Section 71–147(1), Oregon Compiled Laws Annotated.[3] Appellant's arguments are (1) that there was no inspection prior to weighing in and (2) that appellant impliedly requested more time to inspect the hops, and that under subsection (2) of the above statute, appellee was bound to extend it. The contention that there was no inspection of the hops prior to weighing in rests primarily on an argument that the Ray Co. did not have authority to accept or reject the hops. We do not agree. According to the testimony of one of appellant's witnesses the practice in prior years was to send samples to the appellant and appellant would accept or reject the hops on the basis of these

---

3. This statute provides:
  "(1) Where goods are delivered to the buyer, which he has not previously examined, he is not deemed to have accepted them unless and until he has had a reasonable opportunity of examining them for the purpose of ascertaining whether they are in conformity with the contract.

  "(2) Unless otherwise agreed, when the seller tenders delivery of goods to the buyer, he is bound, on request, to afford the buyer a reasonable opportunity of examining the goods for the purpose of ascertaining whether they are in conformity with the contract.
  "(3) * * *."

samples. At the time of weighing in the hops appellant's representative would take "tryings" from each bale of hops and compare these with the type samples previously taken to determine if the hops conformed to the samples and, if so, they were then accepted by the agent. According to the evidence the same procedure was followed with this particular crop. Appellant's argument of lack of authority must rest therefore on the assumption that the change in procedure (which is said to have limited the agent's authority) was known to appellee and was agreeable to him. The court did not so find. Therefore, as appellant's agent had authority to accept or reject hops in previous years (based on their conformity with a sample previously passed by the principal) and as no change occurred in the method of handling the hops, the determination of appellant to inspect the hops at its Eastern office based on "tenth bale samples" taken at the time of weighing the hops amounted to a secret instruction between the principal and agent and cannot be binding on a third person as a limitation of the agent's authority.[4]

Appellant contends however, that by taking "tenth bale samples" it impliedly requested a reasonable opportunity to examine the hops, and, by virtue of subsection (2) of the above quoted Oregon statute (note 3) appellee was bound to allow it. The trial judge was concerned about the reason for taking "tenth bale samples" and additional testimony was introduced by both parties on this point. From this additional testimony the inference is certainly permissible that the taking of "tenth bale samples" prior to weighing in was for other purposes than inspection and would not be understood as a request for a reasonable time to inspect the hops. Moreover from the evidence in the record it appears that appellant's agent conducted a rather thorough examination of the hops at the time of taking the "tenth bale samples" and thus appellant was afforded an ample opportunity to inspect the hops.

The custom we have noted was properly applied to this contract. It is true that a custom or usage may not be given the effect of creating an agreement where none existed. But in the instant case the contract exists though it is silent as to method of inspection, passing of title, and acceptance. The court found that the custom was in existence and was known to the parties at the time the contract was entered into. Under these circumstances the Oregon decisions hold that custom is admissible to establish the missing details.[5] The finding that such a custom existed is supported by substantial evidence and the trial court did not err in applying it to the contract in question.

### Method of Recovery

No extended discussion need be made on this phase of the case. The hops having been segregated, received, inspected and weighed by appellant and actually accepted by it, the title to the hops passed to it and appellee could maintain this action for the price thereof.[6]

Nor does the "liquidated damage" clause contained in the contract affect the method of recovery. That clause reads as follows: "* * * and *should the Buyer fail to accept and pay for the hops* herein agreed to be sold, the Seller not being in default in the terms and conditions hereof to be by the Seller kept and performed, in the event the market value of the hops shall be less than the contract value, the Seller shall be entitled to receive, as liquidated and ascertained damages for such breach on the part of the Buyer, the difference in value between the market value of the kind, quality and quantity of hops in this contract mentioned at the specified place of delivery on the 31st day of October, 1947, and the contract value of the quantity of said hops as herein specified." (Emphasis supplied.)

4. Thomas v. Smith-Wagoner Co., 114 Or. 69, 234 P. 814; White v. Gordon, 130 Or. 139, 279 P. 289.

5. Hurst v. Larson, 94 Or. 211, 184 P. 258; Crosland v. Sloan, 123 Or. 243, 261 P. 701; see also Williston on Contracts (Rev.Ed.) Vol. 3, Sec. 652; and Restatement of Contracts, Sec. 246(b).

6. Sec. 71–163, O.C.L.A.

As previously stated the trial court found that appellant accepted the hops. In this view of the case the above clause by its own terms is inapplicable. The contract being fully executed by appellee and title having passed to appellant this action for the price may be maintained.

One other alleged error deserves mention. Appellant contends that the "grower's market price" was not selected by appellee in writing as required by the contract and that appellee is therefore bound by the floor price of 45 cents per pound. This contention is without merit. The testimony of Noakes, the man who negotiated the contract on appellant's behalf, clearly shows a waiver of this provision of the contract.

We have examined all of the remaining errors asserted by appellant. No useful purpose would be served by further discussion of them. We have carefully reviewed the record and we are convinced that a fair decision was reached. The findings of fact and conclusions of law are not erroneous. The judgment is affirmed.