Submitted on briefs May 24; modified June 21, 1932

# LAKE COUNTY PINE LUMBER CO. *v.*
# UNDERWOOD LUMBER CO.

(12 P. (2d) 324)

*D. V. Kuykendall,* of Klamath Falls, and *O. C. Gibbs,* of Lakeview, for appellant.

*Arthur D. Hay* and *Forrest E. Cooper,* both of Lakeview, for respondent.

CAMPBELL, J.   On January 5, 1929, plaintiff, an operator of a sawmill, entered into an agreement with defendant, who operated a factory for the manufacture of box shooks, whereby plaintiff agreed to sell and defendant agreed to buy about 4,000,000 feet of bright, white pine box lumber to be manufactured during the sawing season of 1929.

The agreement, so far as it is necessary for a determination of this case, reads as follows:

"* * * the seller hereby sells to the buyer who hereby purchases from the seller the said 4,000,000 feet of bright white pine box lumber to be sawn by the seller at the sawmill at Lakeview, Oregon, all to be manufactured during the sawing season of 1929, it being understood that part of the said lumber is already manufactured, at the stipulated and agreed price of eighteen dollars and fifty cents ($18.50) per thousand feet for all box lumber and nineteen dollars ($19.00) for that lumber that is specially cut to 1-9/16 in the green and tallied as 1-3/8.

Any cull lumber shall be tallied on the basis of box lumber contained in such boards.

TERMS. Buyer agrees to pay for such lumber on the following basis: Sixty day (60) acceptance dated from 1st of month following delivery, settlement to be made on the tenth of month following delivery of said lumber.

SPECIFICATIONS. All lumber to be full in thickness when dry and to be full in width. Any lumber falling scant in thickness to be tallied as the next thickness under and any lumber falling scant in width is to be tallied as the next width under. Thus, a piece 11 7/8 is to be tallied as 11" and a piece 10 7/8 in width is to be tallied as 10", or a piece 1 3/8 on one edge and 1 1/2 on the other is to be tallied 1 1/4" lumber.

QUALITY AND GRADE. It is understood that the seller will manufacture approximately one million feet (1,000,000) of 1 3/8 box and three million (3,000,000) of 6/4 box to apply on this contract.

TALLY. All lumber must be tallied at the yard of the seller by a tallyman suitable. All box lumber shall be tallied by what is known as piece tally.

DELIVERY. All lumber to be cut under this contract will be considered delivered when trucked to and dumped in the yard of the seller (buyer) in a good workmanlike manner. All widths of box lumber to be segregated as customary to the trade."

The facts upon which plaintiff bases his first cause of action are substantially:

On November 1, 1929, plaintiff's yard at its sawmill, about 17 miles from Lakeview, was filled to capacity with lumber consisting of 1,039,221 feet of box lumber, manufactured for defendant and large quantities of lumber of upper or better grades. Plaintiff claims defendant wrongfully refused to accept delivery on such lumber after November 1, 1929, thus making it impossible, because of the lack of space, for plaintiff to continue manufacturing box lumber to apply on the contract after that date. Plaintiff claims that on November 1, 1929, when defendant refused to accept delivery, it had on hand at its sawmill 1,071,460 feet of sawlogs ready to be sawed into lumber, and that because of defendant's refusal to accept deliveries, it was unable to saw said logs into lumber on account of lack of storage space, and was compelled to and did hold said sawlogs over until the season of 1930, and then manufactured same into lumber, thereby causing plaintiff to suffer damages itemized as follows:

| | |
|---|---:|
| For general damage in loss of profits | $1,422.00 |
| For decking the logs to carry them over | 803.60 |
| For interest charges on money invested | |
| Item (1), on money invested in logs | 484.88 |
| Item (2), on money invested in the lumber | 330.65 |
| For cost of putting the decked logs into the mill-pond | 214.29 |
| For general overhead expense | |
| (1) Proportion of such overhead charged to logs | 835.74 |
| (2) Proportion of such overhead charged to box lumber | 581.49 |
| For excess cost of manufacturing logs into lumber | 910.74 |
| For fire insurance on box lumber | 81.60 |
| Total claimed on first cause of action | $5,664.99 |

The facts alleged by plaintiff, constituting his second cause of action, are in substance as follows:

On November 1, 1929, plaintiff had on hand at its sawmill 1,039,221 feet of box lumber, which it claims was then ready for delivery to defendant under the terms of the contract; at defendant's instance and request, it held and carried said lumber over until 1930 when it was delivered to defendant; that the cost, charges and expenses of carrying the said lumber and the additional costs of delivery in 1930, plaintiff itemized as follows:

| | |
|---|---:|
| For interest charges on money invested ....$ | 354.81 |
| For fire insurance | 99.11 |
| For warehousing charges paid by plaintiff | 488.43 |
| For proportionate amount of depreciation on plant equipment | 537.53 |
| For proportionate amount of general overhead expense | 573.03 |
| For additional expense of yard handling of said lumber | 37.25 |
| For additional expense of shipping or transporting | 374.81 |
| For degrading of lumber | 81.35 |

Total claimed on second cause of action..$2,511.35

Defendant's defenses to both causes of action may be summarized as follows: Defendant denied the allegations of the complaint and alleged that it had done all things required of it to be done and performed under the contract; then further alleged that the contract required plaintiff to deliver dry lumber and was so construed and acted upon by both plaintiff and defendant; that deliveries of lumber under the contract, during the months of June to September inclusive, occasional truck loads of green lumber were accepted by

defendant for plaintiff's accommodation; that during the month of October, 1929, much green lumber was delivered in defendant's yard which defendant at first refused to accept, but finally did accept for plaintiff's accommodation, but with the distinct understanding that no more green lumber would be delivered except one or two truckloads that plaintiff had piled on "jacks"; that thereafter no more lumber was delivered to defendant by plaintiff during the year of 1929; that the 1,039,221 feet of manufactured box lumber on hand in plaintiff's yard, November 1, 1929, was green and unfit for delivery to defendant under the terms of the contract; that such lumber remained in that condition until after it had been received by defendant during the year 1930 and had been piled and dried in defendant's yard under a separate arrangement; that the lack of storage space during the time plaintiff was unable to manufacture its sawlogs into lumber was caused by the storage therein of the aforesaid green box lumber and large quantities of upper grade lumber; that any delay of the manufacture of the sawlogs into lumber, and all losses and damages claimed by plaintiff therein, was due to and caused by the lack of storage space above stated, and was not induced or caused by failure of the defendant in performance of the contract; that any and all losses, claimed by plaintiff in its second cause of action, on account of holding and carrying over the box lumber, and delivering it in 1930, was caused by the fact that such lumber was green and unfit for delivery under the terms of the contract and not due to any failure or default of defendant.

The cause was tried to a jury who returned an itemized verdict in favor of the plaintiff as follows:

"ON ITS FIRST CAUSE OF ACTION:

| | |
|---|---|
| For general damage in loss of profits and/or increase of losses | $1,422.00 |
| For decking logs | 803.60 |
| For interest charges | |
| Item (1) | 484.88 |
| Item (2) | 330.65 |
| For putting logs into millpond | 214.29 |
| For general overhead expense | |
| Item (1) | 417.87 |
| Item (2) | 345.00 |
| For excess cost of manufacture | 216.67 |
| For fire insurance | 81.60 |

Total on first cause of action ........$4,316.57

ON ITS SECOND CAUSE OF ACTION:

| | |
|---|---|
| For interest charges | $ 300.00 |
| For fire insurance | 91.11 |
| For depreciation | 268.77 |
| For general overhead expense | 500.00 |
| For yard handling | 37.25 |
| For shipping expense | 347.81 |
| For degrade | 50.00 |

Total on second cause of action ......$1,594.94"

A small sum included in the verdict was remitted and judgment thereafter entered in favor of the plaintiff.

Defendant appeals; it asserts the following errors:

1. The court erred in failing and refusing to construe the contract upon which plaintiff's causes of action are based and in refusing to give to the jury defendant's requested instruction No. 1.

2. The court erred in admitting and receiving in evidence, over defendant's objection, plaintiff's exhibit "C".

3. The court erred in admitting and receiving in evidence, over defendant's objection, plaintiff's exhibit "F".

4. The court erred in entering judgment for plaintiff upon the verdict for $5,630.90 for the reason that the item of $1,422 allowed by the jury in their verdict, "For general damages in loss of profits and/or increases of losses, under paragraph VIII, page 4 amended complaint," is not supported or sustained by the evidence.

5. It erred in entering judgment upon the verdict for $5,630.90 for the reason that the item of $500 allowed by the jury in their verdict, "For general overhead expense, paragraph IV (e), page 10 amended complaint," is not supported or sustained by the evidence.

1. It is no longer debatable that the court must construe written instruments: Oregon Code 1930, 2-305.

The contention of the appellant is that the contract calls for delivery of dry lumber only. It is not so nominated in the contract. Appellant, however, contends that the construction given the contract by both parties was that it meant to cover sale and delivery of dry lumber only. This proposition is denied by respondent. It, therefore, became a question of fact to be submitted to the jury, not to construe the contract but to determine from the evidence if the construction contended for by respondent had been placed upon it by the parties.

This is what was actually submitted to the jury under the court's instructions. The court, in submitting the question, very fully instructed the jury in the law. He called their attention to the fact that it was the

intent of the parties that was to govern; if there was usage or custom known to both parties, when the contract was entered into, that fact should be taken into consideration; the knowledge each had of the other's understanding as to what the contract meant; the knowledge of the seller regarding the use of the lumber by the appellant, and if the jury arrived at the conclusion, from the evidence and the surrounding circumstances, that the contract was intended to cover only the sale and delivery of dry lumber, then the plaintiff could only recover "such damages as were caused by defendant's refusal to accept such lumber as was dry and cannot recover any damages caused by defendant's refusal to accept green lumber." It was not error to submit the question to the jury as it was submitted.

The defendant requested 10 separate instructions of which No. 1 reads as follows:

"You are instructed that the contract, plaintiff's exhibit "A", required the delivery of dry lumber by the plaintiff to the defendant and that the defendant could not be required to accept delivery of lumber, under the terms of the contract unless or until it was dry."

The other nine instructions requested by defendant were inconsistent with No. 1. If No. 1 were correct, the others were erroneous or vice versa. These instructions were not submitted as alternatives. If the court should have given them all, the jury would have been unable to determine which rule of law to accept. But as heretofore said, on the face of the contract, appellant was not entitled to instruction No. 1 and there was no error in the court's refusal.

2. This error is based on the admission in evidence of respondent's exhibit "C".

On November 2, 1929, appellant wrote to respondent the following letter:

"TO THE MILLS:

On account of conditions coming up that was unforseen, and thereby causing business to slacken in general making it possible for us to curtail our production, it has been impossible for us to move the volume we anticipated.

We are taking this means of asking you to hold up delivery of lumber to our yard until such time that we receive sufficient shipping instructions on our present order file to enable us to receive further lumber from you.

We hope that it will not be but a matter of a few weeks when conditions change so we can ask you to deliver your lumber. At the present time we are at a loss as to when that time will be.

We ask that you kindly co-operate with us at this time and assure you that just as soon as we are in shape to take more lumber, we will advise you accordingly."

This letter was introduced in evidence as plaintiff's exhibit "B".

Respondent's answer to that letter is plaintiff's exhibit "C" and is as follows:

"Underwood Lumber Co.,
  Lakeview, Oregon.
          *Attention Mr. J. C. Clark, Mgr.*
Gentlemen:

We acknowledge receipt of your letter of Nov. 22nd, with reference to your inability to accept delivery of box lumber, which you contracted to take and pay for as delivered.

We appreciate the difficulty in which you find yourselves placed and it is our earnest desire to co-operate in relieving you of embarrassment, as far as practicable.

However, we wish to call to your attention, the extremely serious situation, your refusal to accept de-

livery of the lumber you contracted for, has and is placing us in.

In the first place, we were forced to shut down our mill a month earlier than we intended, because of congestion in our yard, due to your refusal to accept delivery of box lumber during the month of October. Further, we now have 500,000 feet of this box lumber, over half of which was sawn a special thickness on your orders, and all of which should have been delivered to and received by you, during the month of November and which has been in pile in our yard for 60 to 90 days. In addition we have another 500,000 feet which has been in pile in our yard for from 30 to 60 days, making a total of a million feet of box lumber, half of which is of the special thickness you ordered cut, and all of which you contracted to accept and receive as fast as we delivered it in your yard at your planing mill in Lakeview.

The plan under which our operations are being financed makes the cost of carrying this lumber in pile, between twenty five and thirty cents a thousand feet per month. Besides this, we have been considerably damaged and have suffered a considerable financial loss, on account of being forced to close down our milling operations, a month earlier than intended.

Now, we do not think we should be expected or asked to stand the expense of carrying this lumber you contracted for, until you are ready to accept delivery, in addition to the other expense and loss incurred through your refusal to comply with the terms of your contract with us.

Money to finance the manufacture and yarding of the lumber contracted for by you, was secured on our 90 day notes, secured by a lien on the lumber. It follows that since a large portion of the lumber has already been in our yard approximately 90 days, these notes are about to fall due and must be taken care of in some manner. Failure on our part to make satisfactory arrangements for extension of time in which to pay them, would result in loss to us of such extent as would be hard to compute at this time. Therefore, we

must insist that something shall be done to help us carry this lumber, until such time as your company can accept delivery and make payment in full for all of it.

We are disposed to make such reasonable concessions as are necessary, fair and equitable, to both your company and ours, and will result in alleviating the difficulties of each as far as possible.

Awaiting your prompt reply and any suggestions you have to offer, we are,''

Respondent's exhibit "B" was admitted without objection, as it was some evidence of the reasons given, at the time, by appellant as to why it had refused to receive the lumber. It tended to confirm the stop-order it had given earlier in November. It amounted to a request for a modification of the contract. Exhibit "C" therefore became a part of the contract as showing the conditions under which respondent was accepting the proposal contained in exhibit "B" and really became a part of the res gestae of the transaction.

██ It was also admissible for the purpose of showing notice to the appellant of the probable disabilities that it was enforcing upon respondent and the special damages that might arise therefrom thus giving appellant an opportunity to minimize the damages or, by accepting the offered lumber, avoid any damages whatever: *McDonald v. Supple,* 96 Or. 486 (190 P. 315); Oregon Code 1930, § 9-210.

██ 3. This assignment of error is based on the admission in evidence of respondent's exhibit "F". This exhibit consists of eight load tallies taken from respondent's records, each having attached thereto a weight slip purporting to show the weight of the load. There is no question of any part of the exhibit except the attached weight slip. Four of these load tallies and

their weights were identified by Mr. Clark, manager for appellant, and a witness in its behalf, and introduced in evidence by appellant as exhibit 13. As to these four slips of exhibit "F", appellant has no cause for complaint.

It appears that during the month of October some loads of lumber were weighed. The testimony shows that the way these weights were obtained and how identified was in the following manner: A tally slip in triplicate was made in respondent's yard for each load when the load was made ready for delivery. One of these was immediately mailed to appellant, one filed in the office of respondent, one given to the truck hauler who was to deliver the load. Each load, that was weighed, was taken to a scales owned and operated by an independent, disinterested party, where it was weighed and a weight slip given the hauler. The load was then delivered in appellant's yard and the weight given to appellant's yard foreman. The tally slip and weight slip were then returned by the hauler to respondent's office where they were attached together. Appellant's yard foreman, Mr. Palmerlee, a witness for appellant, was asked on direct examination:

"Q. What about the weighing of the lumber, if anything, during the month of October?

"A. It was weighed, because I would get weight slips from the truck driver. He had told me it was weighed. I would ask him just for my own information, and for the office, to give me the weight slips. He said he had to return them so I would take the weight slips and write out the numbers on the lumber."

Appellant had ample opportunity of checking the weights. They seemed to have been received by the appellant without objection to their correctness. The weights of certain loads introduced by appellant agreed

exactly with the weights of certain loads in respondent's exhibit "F".

No claim that the scales, upon which the weighing was done, might have been incorrect, nor that the weighing was not correctly done, was made at the time of delivery, but the weights were accepted without objection, nor was there any objection to their admission in evidence on these grounds. Under the circumstances, the admission of respondent's exhibit "G" was without error: *Ladd v. Sears,* 9 Or. 244; *Hildebrand v. United Artisans,* 50 Or. 159 (91 P. 542); *State v. Merlo,* 92 Or. 678, 682 (173 P. 317, 182 P. 153).

■ 4. This assignment of error is based on the lack of evidence to support in full the item of "General damages of loss of profits or increase of losses," in the full amount of $1,422.

The court properly instructed the jury that the measure of damages on this item was the difference between the contract price and the amount realized from resale with the addition of reasonable expenses properly incidental to carrying and resale: *Rose v. U. S. Lumber and Box Co.,* 108 Or. 237 (215 P. 171); *Krebs Hop Co. v. Livesley,* 59 Or. 574 (114 P. 944, 118 P. 165, Ann. Cas. 1913C, 758); *Call v. Linn,* 112 Or. 1 (228 P. 127).

■ The jury having allowed the item in full, we must view the testimony in its most favorable light for respondent. From the logs that it was obliged to deck and carry over, it cut 637,519 feet of box lumber. The market value of this was, and it sold for, $17 per thousand, a loss of $1.50 per thousand, excepting however from the amount 20,000 feet which was sold for $17.50 per thousand, making a total loss of $956.28. This sum respondent is entitled to. In addition to this

amount, he claims that during the season of 1930 the box lumber was sawed 1 3/4 inches thick in the green and sold as 1 1/2 inches thick; that had the sawing been done during the season of 1929 it would have been cut 1 11/16 inches thick in the green, thus creating a loss in quantity of 23,612 feet, which at the rate of $18.50 per thousand amounts to $436.82. The thickness was increased on the judgment of its own manager. There is some evidence that appellant would demand that thickness in case it should become the purchaser for the 1930 output, but the sawing was done long before it entered into such agreement. The manager of respondent felt that it would be good business for 1930 to increase the thickness of its box lumber. This should not be charged to appellant. There is another small sum entering into this item of damages, being interest by reason of a longer delay in receiving payment in 1930 over the time fixed by the 1929 contract. There is evidence tending to support this sum and, therefore, we will not disturb it. There is no competent evidence to support a greater sum than $975.18 for damages on the item under consideration.

5. This assignment of error is based on an allowance in the verdict of the item, ''For general overhead expenses—$500.'' Respondent in its second cause of action claimed an item of $573.06 as the proportionate amount of its general overhead expenses in maintaining its plant and keeping its crew as properly chargeable against the box lumber. The jury allowed $500 for this item. There is evidence tending to support the amount allowed by the jury; therefore, we will not disturb it.

This brings us to the conclusion that the verdict of the jury, upon which judgment was entered, in addi-

tion to the amount voluntarily remitted, was $446.82 greater than there is competent evidence to support. This being a matter of mere computation, there is no necessity for sending the case back for a new trial. The judgment, as entered, will be vacated and modified and one entered for the sum of $5,184.08. Neither party to recover costs or disbursements in this court.

It is so ordered.