TRANSNATIONAL INSURANCE COM-
PANY, a corporation, Plaintiff,

v.

Ralph E. ROSENLUND, Robert M. Mac-
Tarnahan and Foremost Insurance Com-
pany, a corporation, Defendants.

MACLUND, INC., an Oregon corporation,
Plaintiff,

v.

TRANSNATIONAL INSURANCE COM-
PANY, a corporation, and Budget Fi-
nance Plan, a corporation, Defendants.

Civ. Nos. 64–351, 64–315.

United States District Court
D. Oregon.

Aug. 16, 1966.

**16**

Donald Pearlman, Keane, Haessler, Bauman & Harper, Portland, Or., for Transnational Insurance Company and Budget Finance Plan.

Robert Leedy, Portland, Or., for Ralph E. Rosenlund, Robert M. MacTarnahan and Maclund, Inc.

John Gordon Gearin, McColloch, Dezendorf & Spears, Portland, Or., for Foremost Ins. Co.

## OPINION

KILKENNY, District Judge.

Based upon the pleadings, certain answers to interrogatories, depositions and affidavits, the plaintiff in 64–351 has moved for summary judgments against defendants Ralph E. Rosenlund and Robert M. MacTarnahan on the first cause of action and against said defendants on the third cause of action in the same cause, insofar as said third cause of action is based on the issues and allegations set forth in the first cause of action in said case.

As the defendant in 64–315, Transnational Insurance Company (Transnational), on the issue of liability alone, moved for a summary judgment against the plaintiff Maclund on the fourth defense to plaintiff's first cause; on the third defense to plaintiff's second cause insofar as the defense is based on the issues and allegations set forth in the fourth defense; in favor of defendant and against Maclund on the first counterclaim, in favor of defendant and against Maclund on the eighth counterclaim, insofar as the eighth counterclaim is based on the issues and allegations in the fourth defense; in favor of plaintiff and against Maclund on the ninth counterclaim, insofar as the ninth counterclaim is based on the issues and allegations set forth in the first counterclaim; in favor of plaintiff and against Maclund on the eleventh counterclaim, insofar as the eleventh counterclaim is based on the issues set forth in the first counterclaim.

On December 1, 1962, Maclund became the "sole general agent" in Washington and Oregon for Transnational "for the purpose of soliciting, underwriting and servicing" various types of insurance, including mobile-home insurance. Said agreement is attached as an exhibit to the First Amended Complaint in 64–351 and to Transnational's Answer-Counterclaims in 64–315. The term of the agreement was three years, beginning December 1, 1962. Maclund was obliged thereunder to:

"(a) Organize and maintain, * * * a general agency organization and personnel for the solicitation and underwriting of insurance business within the territory and of the types covered by this Agreement;

"(b) Solicit and obtain proposals or applications for such types of insurance;

"(c) Perform the functions of underwriting of such insurance business

written hereunder, including the binding of risks;

"(d) Cause to be prepared, typed, issued and delivered, and make customary endorsements to, all insurance policies written hereunder. * * *"
Art. II, Para. 1.

Maclund further agreed:

" * * * that it will not represent other specialty companies in the territory defined, writing lines of insurance in a similar manner, from similar sources as the Transnational Insurance Company." Art. II, Para. 5.

and further agreed:

" * * * for itself and its personnel that they shall conduct themselves as not to affect adversely the position, good standing or reputation of themselves or the Company." Art. V, Para. 6.

The agreement was negotiated by Transnational to afford it a sales force to sell and service mobile home insurance, as its "specialty". Until January of 1963, Maclund engaged in servicing the "run-off" of policies it had previously placed with Stuyvesant Insurance Company. There is some dispute as to whether this was necessitated by Transnational's lack of a "suitable" mobile-home policy; both sides agree that this activity of Maclund was in the interests of both parties, as preservative of Maclund's good reputation. It is not in issue here.

From then, until May of 1964, Maclund was the sole available conduit in the two states for the "production" of mobile-home business for Transnational. The source was a group of dealer-agents with whom Rosenlund, acting for Maclund, had established contacts. These dealers produced the great bulk, though not the entirety, of the Transnational-Maclund mobile-home business. Maclund solicited the business; calculated the premiums; rated risks; prepared policies; distributed policies and daily reports to the home office, producing agents and persons insured; collected premiums; oversaw the handling of claims by adjusters; filed rates with

Insurance Commissioners, receiving approval thereof; processed cancellations; and advised dealers of renewals.

In 1963, Maclund found that its mobile-home business was waning, and decided to try to sell its agency plant for that business. Its "plant" consisted of small local agents, banks, finance companies and mobile home dealers. Except for four major sub-agents and except one Otto Spindler (counter-signing agent for Washington), none were under any contractual obligations to Maclund. "Sale" of the plant, then, was akin to a sale of "good will", and this type of transaction does not appear to be uncommon. Discussions of the proposed transaction were had with representatives of Foremost, Transnational, Central National and Stuyvesant Insurance Companies. In March of 1964, Foremost made a second offer, the first (in 1963) having been fruitless. Transnational was informed of the offer, although not of its particulars, and asked that Maclund delay decision until Transnational could decide whether it should make a purchase. Subsequently, Transnational decided not to purchase.

On May 4, 1964, the Foremost agreement was concluded. Maclund, Inc., Rosenlund and MacTarnahan were all parties to it, MacTarnahan signing both for himself and for Maclund. These three agreed:

"1. * * * to work diligently with Foremost and to use their best efforts, individually and collectively, for a period of four years from and after the effective date of this agreement [April 1, 1964], to persuade all existing accounts (as set forth in Exhibit "A") to write all future business of this type [mobile home business] with Foremost. * * *" (Bracketed material supplied.)

They further agreed that they would not:
"2. * * *

"a. Solicit, accept or write any mobile home physical damage insurance for or with any insurance company other than Foremost, except

through agents who are not mobile home dealers and who do not obtain their business directly or indirectly from mobile home dealers. * * *

"b. Give any other person, firm or corporation the right to solicit, accept, or write such types of insurance for or with any of its present or past mobile home physical damage insurance accounts. * * *

* * * * * *

"f. Directly or indirectly compete, whether as insurer, agent, broker or employee or representative of insurer, agent or broker, or in any other capacity, with Foremost in the mobile home physical damage insurance field in the States of Oregon and Washington."

The consideration was $1.00 to Maclund and MacTarnahan, plus an assured compensation for Rosenlund according to a formula set forth in the agreement, Rosenlund being the person who would service the Foremost accounts with the dealer-agents. Also, on May 4, 1964, Maclund assigned to Rosenlund, in exchange for all of his capital stock in the company, the entirety of Maclund's mobile-home insurance business, granting him the right to commit Maclund not to compete with any purchaser to whom he should sell. This apparently included *all* of its business, by the language of the assignment, not *only* the dealership-relations which Maclund had established. Maclund views this as a sale to Foremost, taking the form of an agreement with Foremost and assignment to Rosenlund only for tax purposes. Rosenlund, however, became the owner of the mobile-home plant, and was committed to Foremost's service only for four years. He signed the Foremost agreement only as himself, not as a representative of Maclund. Further, it is to be noted that MacTarnahan individually profited by this deal, becoming the sole owner of Maclund.

Rosenlund and Mr. Eardly, Foremost's Northwest Production Manager, visited a number of mobile-home dealers with whom Maclund had contracts. "to advise agents that Maclund was now represent-

ing Foremost." Rosenlund admits telling them that "we were no longer—that Maclund was no longer writing mobile-home business through dealers." The record contains several affidavits from dealers, saying that they were told that Maclund had switched its business from Transnational to Foremost; that Transnational did not write policies directly nor would Maclund represent Transnational henceforth, but that Foremost would write policies directly; and so forth.

Gross premiums reported to Transnational by Maclund, for mobile home insurance produced by dealers, were $16,237.24 (March, 1964); $14,251.77 (April); $357.50 (May); $325.00 (June); and $53.00 (July). After July, Maclund did not represent Transnational at all.

In a letter dated April 21, 1964, Transnational's Executive Vice-President, E. B. Crittenden, made it clear that he considered the "sale" of Maclund's "dealership plant" a breach of the Transnational agreement. He spoke of the sale as an accomplished fact, discussed the probability of terminating the agreement as soon as a "revised program in the Northwest" could be negotiated. Crittenden twice requested a copy of the "sale" contract. He had apparently been informed that the transaction had already been concluded. Transnational did not know, as of the date of this letter, what dealerships were involved and how much volume would be affected. As of August 12, 1964, it still had not seen a copy of the Foremost agreement or the assignment to Rosenlund. During this period, April-May, 1964, Transnational, being dissatisfied with this and other aspects of Maclund's performance of its agreement, was considering a declaratory judgment action to determine its rights to deal directly with dealers in the territory covered.

## FIRST AND THIRD CAUSES OF ACTION IN 64–351

The first cause of action alleges material breach of an exclusive agency con-

tract between Transnational and Maclund by Rosenlund and MacTarnahan, as officers and agent of Maclund, and alleges violation by the defendants of fiduciary duties owed Transnational by them as Transnational's agents. The breach alleged was the execution of an agreement with Foremost Insurance Company, and performance thereunder, by which Transnational's insurance business was damaged. The third cause alleges that Rosenlund and MacTarnahan were and will be unjustly enriched by the payment by Foremost of valuable consideration for their performance of the latter agreement, and that the proceeds should be paid over to Transnational.

### TRANSNATIONAL'S DEFENSES IN 64–315

This proceeding involves allegations by Maclund to the general effect that Transnational, and its parent, Budget Finance Corporation, conspired to squeeze Maclund out of the insurance business.

Transnational's fourth defense to Maclund's first cause of action herein alleges the same breaches of the Transnational-Maclund agreement (hereinafter called "Transnational agreement"), and violation of fiduciary duties thereunder, as are alleged in its first cause of action in 64–351.

Transnational's third defense to Maclund's second cause asserts that it terminated the Transnational agreement with notice and for cause—i. e., the "cause" being the execution of the Maclund-Foremost agreement (hereinafter called "Foremost agreement").

### TRANSNATIONAL'S COUNTER-CLAIMS IN 64–315

Transnational's first counterclaim alleges the breach of the Transnational agreement and violation of fiduciary duties, as alleged elsewhere.

The eighth counterclaim alleges the same as the first, and alleges breach of trust duties during the life of the Transnational agreement, and failure to perform other duties, by Maclund. Only in the former respect is it involved in this motion.

The ninth counterclaim again alleges the same breach of the Transnational agreement, and reiterates the charges of unjust enrichment found in the third cause of action in 64–351, and charges a conspiracy between MacTarnahan, Rosenlund and Foremost in restraint of interstate commerce. The latter allegation is not involved in this motion.

The eleventh counterclaim alleges unjust enrichment to *Maclund* by way of valuable consideration paid it by "competitive insurance companies" during the course of its status as agent of Transnational. It incorporates by reference the first counterclaim and that part of the fourth counterclaim referring to breach of the Transnational agreement.

### SUMMARY OF CONTENTIONS TRANSNATIONAL CONTENDS

1. That the Foremost agreement, and performance thereunder, breached the Transnational agreement, and that MacTarnahan and Rosenlund are liable as Maclund's principals and as inducers of that breach, by Maclund.

2. That Rosenlund and MacTarnahan are liable, as Maclund's sub-agents and as inducers of its action, for Maclund's breach of implied-in-law fiduciary duties to Transnational as its agent.

### DEFENDANTS CONTEND

1. That the Transnational agreement does not restrict Maclund's right to "sell" its agency plant.

2. That Maclund *did* perform its obligations under the contract by performing satisfactorily until the time of the Foremost agreement.

3. That since Maclund was not licensed by Foremost as its agent, or its representative, and since Foremost does not operate "in a similar manner" to Transnational, the agreement was not in violation of plaintiff's rights.

4. That Maclund acted pursuant to the contractual obligation—which it also seems to construe as a reservation of

rights—to act so as to safeguard its own "good standing."

## SUMMARY OF ISSUES

1. Did Maclund have an absolute right to "sell" its agency plant?

2. Was the "Foremost agreement," and performance thereunder, a "representation" of a company operating "in a similar manner?" Did it, under the circumstances, also constitute a failure to perform Maclund's affirmative obligations to solicit business, and maintain an agency plant?

3. Did Maclund, Rosenlund and MacTarnahan violate non-contractual duties of good faith and diligent service to Transnational's interests?

4. Is Transnational estopped by its supposed failure to object to the proposed Foremost agreement?

Defendants in 64–351 do not question the right of a party to a contract to institute an action for wrongful interference with the contract's performance. Consequently, Transnational's right of recovery depends on whether the Foremost agreement breached the Transnational agreement. Bliss v. Southern Pac. Co., 212 Or. 634, 651, 321 P.2d 324 (1958); Sloan v. Journal Pub. Co., 213 Or. 324, 358, 324 P.2d 449 (1958); DeMarais v. Stricker, 152 Or. 362, 365, 53 P.2d 715 (1936). Likewise, it would appear that Rosenlund and MacTarnahan, as principals of Maclund and as its subagents, would be liable for any and all breaches of a fiduciary duty owed to Transnational by Maclund, it appearing that each individual executed the Foremost agreement and each of said persons made an individual profit from it.

## THE RIGHT TO "SELL"

It is the position of Transnational that the Foremost contract did not amount to a "sale" of the plant to Foremost. To be kept in mind is that Rosenlund retained ownership of the mobile-home agency plant, while he and MacTarnahan and Maclund committed their services to Foremost for a period of four years. I do not believe that ultimate liability turns on a precise definition of the word sale. In the last analysis, my decisional problem is whether Maclund had the right to disregard the terms of the then existing contract with Transnational. Rosenlund, MacTarnahan and Maclund would prefer to call the Foremost transaction a "sale", seeking to invoke the concept that as agents, they owned the agency plants and under a general definition of "sale", Capps v. Mines Service, Inc., 175 Or. 248, 251, 152 P.2d 414 (1944), had a right to sign the Foremost agreement. Arriving at that point, said defendants call attention to Article V, Para. 6 of the Transnational agreement, under which Maclund agreed "for itself and its personnel that they shall conduct themselves as to not affect adversely the position, good standing or reputation of themselves or the company."

They then proceed to argue that this provision lends validity to their agreement with Foremost, since that agreement preserved Maclund's good standing. Also, they call attention to the fact that the Transnational agreement does not prohibit them, in express language, from disposing of any part of their business. Furthermore, they direct attention to Article V, Para. 3, which requires Maclund to secure "only desirable business;" Article I, Para. 4, which allows Maclund to strike sub-agents from the agency plant list and Article II, Para. 3, which required the agent to have a separate and independent contract with, and be responsible for, its sub-agents.

■ I find no ambiguity in these provisions, nor do I believe they support defendants' position. Maclund, by those provisions, was permitted to conduct its own business, without interference from Transnational and to keep intact its own agency plant, as against that time when Transnational might take its own business away from Maclund and place it elsewhere or undertake a "direct-writing" policy, thus by-passing the services of a general agent. The "desirable business" provision does nothing more than protect Transnational against

"high risks not contemplated by the rate structure," or business which would not be beneficial to it. The provisions requiring Maclund to preserve its own good standing was obviously made for the benefit of both parties. Although defendants suggest that the language with respect to "position and good standing" is ambiguous they have not argued that particular point and I suggest that there is nothing uncertain about the phrase when used in its proper context. The language of a business contract, such as that before me, must be interpreted as it would "naturally be understood by intelligent men of affairs." Texas Co. v. Butler, 198 Or. 368, 376–377, 256 P.2d 259, 263 (1953), as citing, National Fire Ins. Co. v. Sullard, 97 App.Div. 233, 89 N.Y.S. 934 (1904), and Port Investment Co. v. Oregon Mutual Fire Ins. Co., 163 Or. 1, 94 P.2d 734, 124 A.L.R. 1342 (1939), the defendants argue that the right of "sale" exists where there is no provision to the contrary in the contract. Neither one of these cases fully supports the defendants' argument. Along the same line, the defendants argue that since an agency owns its own "renewals", its agency plant and sources of business, under the above authorities, it had a right to sell.

In every express contract, there is an implied duty on an obligee not to obstruct, hinder, or delay, but on the other hand, he is requested to in all ways facilitate performance of the requirements of the contract. Northeast Clackamas County Elec. Co-op. v. Continental Cas. Co., 221 F.2d 329 (9th Cir. 1955); Upper Columbia River Towing Co. v. Glens Falls Ins. Co., 179 F.Supp. 705 (D.Or.1959). In every contract there

is an implied covenant of good faith, i. e. that neither party will do anything which will destroy or injure the right of the other party to receive the fruits of the contract. Perkins v. Standard Oil Co. of Calif., 235 Or. 7, 383 P.2d 107, modification denied 235 Or. 7, 383 P.2d 1002 (1963). The transaction with Stuyvesant cannot be related to the transaction between Transnational and Maclund. Stuyvesant did not deal with Maclund as its exclusive agent and had not committed itself, as did Transnational, to rely alone on Maclund to generate business in two states. The exclusive character of the agency agreement in question is all important. In *Sullard,* supra, cited by defendants, the agent represented several companies. The same can be said of *Port Investment.* The decision in neither case is here of any particular significance. *Port Investment* presented the additional question of whether both agent and *former* principal have the right to use "expirations." Here, I might add, the decision in *Port Investment* in part, at least, supports Transnational's position. The significance of the fact that Maclund had undertaken to be Transnational's *exclusive* agent, is emphasized by certain other language in *Port Investment.*[1]

On a review of all the undisputed evidence before me, interpreted in the light of the applicable law, I must hold that the Foremost agreement rendered completely useless certain material provisions of the Transnational agreement and, irrespective of whether Maclund retained ownership rights to its plant, the contract with Foremost served as a breach and likewise violated the implied duties assumed by Maclund under the

---

1. "Although the * * * Company represented other insurance companies, it was inhibited by the terms of its contract from placing any business with them that could be placed advantageously with the defendant, and it agreed to use its best efforts at all times to build up the business of its principal. Its duty, under the contract, was primarily to solicit for and on behalf of the Oregon Mutual Fire Insurance Company, and not on its own behalf. * * * We are unable to see how, consistently with the duties which the plaintiff freely and voluntarily undertook in the agency contract, it can be heard to say that it now has the right not only to solicit the policyholders whom it secured for the defendant, but also to deprive its former principal of the fruits of the business which was promoted and built in pursuance of that undertaking." 163 Or. at 20, 94 P.2d at 741.

Transnational contract. The fact that the plant may still be owned by Maclund is not a bar to Transnational's action.

## EFFECT OF PERFORMANCE OF FOREMOST AGREEMENT

Closely related to defendants' theory that the Foremost agreement did not constitute a sale, is the other contention that, in fact, they did perform, for a time, all of their obligations under the Transnational agreement and that the agreement with Foremost was entirely consistent with the provision binding it to protect its own good standing. That this argument is fallacious has already been demonstrated. Defendants practically concede that the Foremost agreement and performance thereunder, in essence destroys a performance under the Transnational agreement. Maclund, under the Foremost agreement, must not "solicit, accept or write" policies for mobile homes produced by dealers for or with any company other than Foremost. The instrument requires Maclund to "work diligently with Foremost and to use their best efforts, individually and collectively * * * to persuade all existing accounts * * * to write all future business of this type with Foremost." Manifestly, this provision was calculated to switch all of the business from Transnational to Foremost. In a similar vein, the Foremost contract forbids arranging licenses for dealers or obtaining contracts from dealers with any other company, and bars competition with Foremost "directly or indirectly."

[5, 6] Any voluntary affirmative act of a party which renders substantial performance of his contractual duties impossible, or apparently so, constitutes a total breach of any contract. Mohr v. Lear, 239 Or. 41, 48, 395 P.2d 117 (1964). In addition to the activities of Rosenlund in visiting sub-agents or dealers, MacTarnahan contributed his part to the breach by discontinuing the Transnational accounts. Here, when we speak of

MacTarnahan, we speak also of Maclund, his principal. Rosenlund, accomplished the same purpose by making calls on various dealers, having in mind nothing but to persuade them to switch business from Transnational to Foremost. That the actions of defendants were effective, is demonstrated beyond doubt by the fact that the gross premiums for Transnational suffered a precipitous drop in May to July, 1964, and shortly thereafter became non-existent. Defendants' argument that the contract would lack mutuality, if construed as forbidding Maclund to dispose of its agency plant in the manner here urged, is of no weight. We must keep in mind that Maclund obtained from Transnational an exclusive agency for any insurance to be written in the Washington-Oregon market. Certainly, any policy withdrawn from Maclund and placed with Foremost would depreciate the available insurance market.

Other points raised by defendants is that their agreement with Foremost is outside of the scope of Article II, Paragraph 5, (1), in that defendants did not "represent" Foremost and (2), in that Foremost does not write insurance "in a similar manner" as Transnational. Although defendants deny that Maclund was licensed as an agent of Foremost, the undisputed facts would indicate that some type of an agency was, in fact, concluded between those parties. Of significance is the following undisputed evidence: (1) the Oregon Department of Insurance licensed Maclund and its two principals on August 3, 1964,[2] (2) shortly after April 20, 1964, Foremost asked Maclund to fill out certain forms to facilitate the licensing of Rosenlund and MacTarnahan, (3) Foremost sought licenses for MacTarnahan and Rosenlund on July 1, 1964,[3] and (4) Eardly states that Maclund was "appointed" by Foremost as its agent on April 20, 1964.[4] I do not believe there is a dispute of a material fact on this point.

2. Although this statement is not denied, I do not find a copy of the license in the evidence.

3. Eardly Deposition, page 99.

4. Eardly Deposition, page 98.

Be that as it may, I am of the belief that it is not important whether "an agency agreement" was affected between Foremost and the defendants during the life of the Transnational agreement. That issue, in my opinion, is not material. The Transnational agreement prohibits Maclund from representing other specialty companies. Both Transnational and Foremost are specialty companies, specializing in mobile-home insurance. There is no dispute on this fact. That Transnational, Maclund and the other defendants were of the belief that it was not necessary for Maclund to be licensed as Transnational's agent is attested to by the fact that no such licensing occurred from December 1, 1962, through June 25, 1964, the life of the Transnational agreement. The parties themselves placed this interpretation on the contract and that interpretation is binding on me. Perkins v. Standard Oil Co. of Calif., supra, 235 Or. p. 15, 383 P.2d 107. The defendants' argument that Foremost did not write insurance "in a similar manner" to Transnational lacks judicial support. Foremost, it is urged, is a "direct writer," meaning that it by-passes the services of general agents. Although this particular interpretation is disputed by Transnational, the controversy is theoretical in nature and, in my view, not necessary to a decision on the issues before me. If the word used is plain, clear, definite and unambiguous, it will be taken as the final evidence of the intent of the parties. Salem King's Products Co. v. Ramp, 100 Or. 329, 196 P. 401 (1921). The office of the Court is to ascertain the meaning of the language used and then enforce it in accordance with its legal effect. Fred Meyer, Inc. v. Central Mutual Ins. Co., 235 F.Supp. 540 (D.Or.1964); Lake County Pine Lbr. Co. v. Underwood Lbr. Co., 140 Or. 19, 26, 12 P.2d 324 (1932). The word "similar," when used in its present context, is not ambiguous. To interpret the contract in accordance with defendants' contentions, would render it completely meaningless. A witness [5]

testified that a direct-writer approaches the customers and not the dealer and that "we don't approach the customer at all." While Maclund, or the other defendants, did not "represent" Foremost in "approaching customers," it *did represent* Foremost in calling on dealers and persuading them to place their business with Foremost. All other functions were performed by Foremost through its branch office. It is undisputed that Macland undertook to, and did act in Foremost's behalf, and it is beyond cavil that Foremost benefited from Maclund's services in a manner which was "similar," to the manner in which Transnational had previously been served. If Foremost did not write insurance in a manner "similar" to Transnational, it would seem to naturally follow that the companies would not be competitors. The record conclusively shows that these companies were, in fact, competitors for this specialty type of business and, as previously mentioned, Transnational's premiums from this source completely disappeared a few months after the execution of the Foremost agreement. "Similar" is judicially defined as "[n]early corresponding; resembling in many respects; somewhat alike; having a general likeness." Tedesco v. United States, 118 F.2d 737, 741 (9th Cir. 1941).

### SUPPLEMENTAL THEORIES

Closely related to each of the foregoing subjects is the nature of the legal duty which Rosenlund, MacTarnahan and Maclund owed to Transnational. Whether a true fiduciary relationship existed between them and Transnational is not important. The fact remains that they were representatives and were legally bound to act solely for the benefit of the principal in all matters covered by the contract. Hughes v. Helzer, 182 Or. 205, 224, 185 P.2d 537 (1947); Duniway v. Barton, 193 Or. 69, 78, 237 P.2d 930 (1951). They were placed in the position of owing Transnational the utmost good faith and devoted service. Dahl v. Crain, 193 Or. 207, 223, 237 P.2d

---

5. Eardly.

939 (1951) and John I. Haas, Inc. v. State Tax Comm'n, 227 Or. 170, 180, 361 P.2d 820 (1961). I am not impressed with the defendants' argument that they were independent contractors and did not owe the duty of good faith. Such contractors, when they undertake to promote the business of the principal, are subject to the duties of loyalty and obedience to the wishes of the principal. Marnon v. Vaughan Motor Co., Inc., 184 Or. 103, 172, 194 P.2d 992 (1948). The fact that the duty of good faith was not specifically mentioned in the agreement is inconsequential. The duty was inherent and implied in the agreement.

## WAIVER AND ESTOPPEL

Although defendants insist that Transnational is estopped to proceed with this action and claim that it waived its rights under the contract, there is nothing in the record to give support to either theory. Under Oregon law, the basis of an equitable estoppel is that a party against whom it is urged or someone in privity with him, has said or done something which he ought not to have said or done, or has omitted to say or do something which he ought to have said or done, and because thereof some other person has been misled and thereby induced to change his position in some material respect. First National Bank of Portland v. Stretcher, 169 Or. 532, 129 P.2d 830 (1942); Marshall v. Wilson, 175 Or. 506, 154 P.2d 547 (1944). On the other hand, waiver, as distinguished from an estoppel, is the intentional relinquishment of a known right which must be manifested in some unequivocal manner. Waterway Terminals Co. v. P. S. Lord Mechanical Contractors, 81 Or.Adv.Shts. 285, 406 P.2d 556 (1965); Upper Columbia River Towing Co. v. Maryland Cas. Co., 313 F.2d 702 (9th Cir. 1963). The facts in this case do not present an issue on either estoppel or waiver. Another point which is raised by the defendants is that Transnational had the right to terminate the 1962 agreement if Maclund's volume of

business, produced from other sources, did not exceed the volume produced by Budget Finance (Transnational's parent.) [6] They vaguely suggest that it would be inequitable to construe the agreement as imposing "more stringent" duties upon Maclund. Transnational's reply completely disposes of this issue. The particular article of the contract lists six grounds for termination, including the one above mentioned, and also "breach of this agreement, or any of the provisions thereof." It further provides that "termination is allowed in either or any of the foregoing events." Maclund's construction would allow it to deprive Transnational of the mobile-home business which, according to the undisputed testimony, was the primary motivating factor of the agreement between Transnational and Maclund. The implied agreement which defendants would impose on Transnational is in complete contradiction with the terms of the agreement itself. The very fact that the agreement provided for this right of termination in Transnational makes it clear that defendants were not provided with such an escape clause.

## SUMMARY JUDGMENT

A Court must be very cautious in granting a summary judgment, in that the relief is drastic and should be applied with caution to the end that litigants will have a trial on *bona fide* factual issues. However, we must keep in mind that Rule 56(e) was amended in 1963 by the addition of the following language: "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." This amendment became effective July 1st of that year. Patently, this amendment placed

6. Article VII, Paragraph 2, Contract.

an absolute duty on the adverse party to set forth specific facts showing that there is a general issue of fact for trial. While there is disagreement between the parties on some issues, there is no disagreement insofar as the material facts are concerned. Most certainly, if the case had reached the trial stage on the record before me and a motion for directed verdict was presented, I would feel compelled to allow such motion on the issues here presented. It is my view that the 1963 amendment was made for the express purpose of forcing the adverse party to show his hand and present facts which would justify a trial on that issue. In general, cases decided before the effective date of that amendment are of little value. A thoughtful discussion of the 1963 amendment is set forth in Lundeen v. Cordner, 354 F.2d 401 (8th Cir. 1966).

Plaintiff's motion in 64–351 for summary judgments against defendants Ralph E. Rosenlund and Robert M. MacTarnahan, on the issues of liability, in the first cause of action and against said defendants, on the same issue, on the third cause of action in the same cause insofar as said cause is based on the issues and allegations set forth in the first cause of action, is allowed.

Transnational's motion for summary judgment, on the issue of liability alone in 64–315, is allowed to the fourth defense to plaintiff's first cause of action; is allowed on the third defense to plaintiff's second cause of action, insofar as the defense is based on the issues and allegations set forth in the fourth defense; is allowed in favor of Transnational against Maclund on the first counterclaim and in favor of Transnational and against Maclund on the eighth counterclaim, insofar as the eighth counterclaim is based on the issues and allegations in the fourth defense; is allowed in favor of Transnational and against Maclund on the ninth counterclaim; insofar as the ninth counterclaim is based on the issues and allegations set forth in the first counterclaim, and in favor of Transnational and against Maclund

on the eleventh counterclaim, insofar as the eleventh counterclaim is based on the issues set forth in the first counterclaim.

Counsel may prepare, serve and present a form of summary judgment in conformity herewith.

## SUPPLEMENTAL OPINION ON CIV. NO. 64–351

For a statement of facts, I refer to my original opinion in 64–315 and 64–351, this day filed.

Before me for consideration is the motion of the defendant, Foremost Insurance Company, for a summary judgment in its favor on plaintiff's first, second and sixth causes of action.

### FIRST CAUSE

With reference to this cause of action, Foremost contends: (1) that it did not knowingly induce a breach of, or interfere with, the Maclund, Inc.-Transnational exclusive underwriting contract and, (2) that it used proper methods to implement the May 4, 1964, agreement between Foremost, Rosenlund, MacTarnahan and Maclund, Inc.

Although I feel that there is no direct evidence of notice to Foremost of the existence of the exclusive clause in the plaintiff's contract, I feel that there may be sufficient circumstantial evidence to justify a jury in finding that Foremost had notice of the clause, or had sufficient knowledge to put it on inquiry as to the exact relationship between plaintiff and Maclund. I reserve ruling on the legal questions raised by defendants on the first cause of action.

### SECOND CAUSE

The plaintiff's second cause is based on 15 U.S.C. §§ 1011–1015, commonly known as the McCarran-Ferguson Act.

I am convinced that both Oregon and Washington enacted sufficient legislation submitting the insurance industry to state anti-trust regulation within the three year period provided in the Act.

It is my belief that the 1947 Oregon legislation, Chapters 20, 337, 338 and 373 of the 1947 Laws, was passed "in

the wake of the McCarran-Ferguson Act" and that it was enacted for the specific purpose of taking advantage of the exemption under McCarran. True enough, the 1947 Oregon Senate Bill 294, on the same subject, died in the House Committee on Financial Institutions, but the principles covered by the Senate Bill were, in major part, made law by the above legislation. Chapter 105, Oregon Laws 1965, which plaintiff claims is the first Oregon law on the subject, is a supplement to, but not a repeal or replacement of the 1947 amendments.

Granted, the 1947 legislation did not follow, word for word, the language of the Federal Anti-Trust laws. A verbatim duplication of the Federal legislation, or of the Model Unfair Trade Practices Bill for insurance, is not required. FTC v. National Casualty Co., 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958). Nor does United States v. Chicago Title & Trust Co., 242 F.Supp. 56 (N.D.Ill.1965) support the plaintiff's position. There, the Court merely held that the Illinois anti-trust law was not applicable to insurance contracts or to contracts with parties outside of the state. Where there is an applicable state statute the federal legislation does not apply. FTC v. National Casualty Co., supra. The Washington legislation is similar to the Oregon legislation. RCW Ann. 48.30.020 (1) (c) and (4).

It is urged that neither the Oregon, nor the Washington, legislation has a provision which provides for private treble damages as part of the regulatory scheme. This, in my opinion, is not a sufficient departure from the federal legislation to justify a holding that neither the Oregon nor Washington legislation qualifies as an exemption under the Act. Of significance is the fact that private treble damages are not recoverable for a violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. It seems the Congress has deemed it advisable to use this type of a weapon in certain types of welfare legislation, while it has failed to do so in others. Nashville Milk Co. v. Carna-tion Co., 355 U.S. 373, 78 S.Ct. 352, 2 L.Ed.2d 340 (1958); New Jersey Wood Finishing Co. v. Minneapolis Mining & Mfg. Co., 332 F.2d 346, 356 (3d Cir. 1964), aff'd. at 381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965). Already, I have mentioned that the decisional law does not require a word for word reenactment of the federal legislation. The argument that 15 U.S.C. § 4 grants to the federal courts the power of injunction and punishment for contempt, and that such remedies are not available under the Oregon or Washington legislation, is completely unsound. The state legislation provides for cease and desist orders. If those orders were not obeyed the states could then revoke the licenses of the insurance companies and their agents. Furthermore, the courts of each of the states, would be open and available for the purpose of enforcing, by contempt proceedings or otherwise, all valid cease and desist orders issued by the insurance departments of the respective states.

## BOYCOTT

Although Section 3(b) of the McCarran-Ferguson Act reserves jurisdiction in the federal system under the Sherman Anti-Trust Act, where there is an agreement to boycott, coerce or intimidate, or where there is an act of boycott, coercion or intimidation, I find nothing in the record before me pointing to a violation by Foremost of the boycott, coercion or intimidation provisions of the later Act.

It would seem that the Congress, when enacting the McCarran-Ferguson Act, was concerned with an activity which is not here indicated. The legislative history shows that the boycott, coercion and intimidation exception, was placed in the legislation to protect insurance agents from the issuance by insurance companies of a "black-list," which would name companies or agents which were beyond the *pale.* This list, in effect, was a directive to an agent not to write insurance in the name of or for the black-listed company; otherwise, he would be stripped of his agency and

not permitted to write insurance for any of the members of the governing organization of insurance companies.[1]

 Entirely aside from the legislative history of the Act, and assuming that the exception is applicable to the arena in which we are working, there is absolutely nothing in this record which would indicate a boycott, coercion or intimidation. The fact that such an allegation is made in the complaint is, since the 1963 amendment to Rule 56(e), of no weight. The plaintiff, in opposing the motion for a summary judgment, is required to present all of his evidence or suffer the consequences. Plaintiff points to the covenant not to compete in the Maclund-Foremost contract and the actions of Rosenlund and MacTarnahan in channeling all, or practically all, of the insurance business previously handled by Maclund from plaintiff to Foremost. The word "boycott," as used in this type of legislation, implies an urging or an agreement with another person to desist from doing business with another. The word does not apply to cases where persons are urged to do business with another. There is a "boycott" when a competitor urges a customer not to do business or to refrain from doing business with another.

Plaintiff emphasizes certain language used in Paramount Enterprises v. Mitchell, 104 Fla. 407, 140 So. 328, 330 (1932).[2] The following sentence in that opinion clarifies the language used.[3] The classical cases of a "boycott" are: (1) an agreement not to do business with others, and (2) in the case of a secondary boycott, the inducement of others not to do business with others. Eastern States Retail Lumber Dealers' Assn. v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914); Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921).

 Cases such as Professional & Business Men's Life Ins. Co. v. Bankers Life Co., 163 F.Supp. 274 (D.Mont. 1958), although involving an alleged "boycott," were decided on a motion to dismiss the complaint, rather than on a motion for a summary judgment. In *Professional,* the complaint made specific allegations charging defendant with inducing the general public to refrain from doing business with the plaintiff by publication of derogatory advertisements, by discrediting the plaintiff and by persuading prospective agents not to represent the plaintiff. Only the pleadings were before the Court. Previously, I mentioned that the plaintiff in this case is faced with the 1963 amendment of the summary judgment rule, which requires plaintiff to go forward and show the facts on which it relies. The discovery procedures of the FRCivP were liberally used in this case. I reach the same conclusion on an analysis of Monarch Life Ins. Co. v. Loyal Protective Life Ins. Co., 217 F.Supp. 210 (S.D.N.Y.1963), rev'd. 326 F.2d 841 (2d Cir. 1963), cert. denied 376 U.S. 952, 84 S.Ct. 968, 11 L.Ed.2d 971 (1964). That case involved a motion to dismiss for lack of jurisdiction of the subject matter. Also, the complaint there alleged that defendants agreed to boycott, withdraw and refrain from further dealings with the plaintiff. California League of Independent Ins. Producers v. Aetna Cas. & Surety Co., 179 F.Supp. 65 (N.D.Cal.1959), presented a typical case for application of the "boycott" exception. There, a group of insurance underwriters had agreed not to deal with the plaintiff except at fixed compensation rates. Of course, this action fell within the historic definition of a boycott. The word "boycott" has a well known mean-

---

1. 91 Congressional Record, p. 1087 (79th Congress, 1st Session.)

2. "In its more modern significance, the term 'boycott' connotes a variety of action, ranging from a mere withdrawal of business by an individual to an organized effort by associated individuals to pro-

cure all others to withdraw from such intercourse."

3. "It is accomplished by means ranging from simple persuasion to the disturbance of business relations * * * by physical intimidation or violence."

ing. Congress is presumed to have used that word in its usual significance and in accordance with common understanding. Herring Magic v. United States, 258 F.2d 197 (9th Cir. 1958); Commissioner of Internal Revenue v. Plestcheeff, 100 F.2d 62 (9th Cir. 1939); Gilbert v. United States, 370 U.S. 650, 82 S.Ct. 1399, 8 L.Ed.2d 750 (1962); Tabor v. Ulloa, 323 F.2d 823 (9th Cir. 1963). Plaintiff argues that the decision in Maryland & Virginia Milk Producers Assn. v. United States, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960), supports their position. With this I cannot agree. There, the defendant was charged with violations of §§ 2 and 3 of the Sherman Act and § 7 of the Clayton Act. The Court placed great weight on the defendant's scheme of acquisitions in connection with a ten year covenant not to compete in connection with the purchase of the assets. No place does the Court call the covenant a "boycott." Even if the word was mentioned, a decision on a ten year covenant would not be authority for applying the same rule to a four year covenant, which is here involved. Here, there is no claim that plaintiff attempted to monopolize under § 2 of the Sherman Act, nor is there a claim of a gathering of assets which might tend to substantially lessen competition under § 7 of the Clayton Act. The *Maryland & Virginia* case does not assist plaintiff. In my analysis of Schine Chain Theatres v. United States, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245 (1948), I reach the same conclusion. To fall within the generally accepted meaning of boycott, there must be: (1) a concerted refrainment from business relations with another, or (2) a concerted persuasion of third persons outside of the combination to so refrain. Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921); Paramount Enterprises v. Mitchell, supra, and W. E. Anderson & Sons Co. v. Local Union No. 311, etc., 156 Ohio St. 541, 104 N.E.2d 22, 32 (1952). It seems that the Irish, as in many other fields, produced the character for whom the term "Boycott" was named.

A scholarly discussion of the origin of the name, quite worthy of attention, is made part of the opinion in State v. Glidden, 55 Conn. 46, 8 A. 890, 896 (1887).

Since the Congressional intent and purpose behind the passage of the McCarran-Ferguson Act was to throw the whole weight of its vast power behind existing and future state systems for regulating and taxing the business of insurance, Prudential Ins. Co. of America v. Benjamin, 328 U.S. 408, 429, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946), it is the Court's duty to liberally construe the 1947 enactments and, if possible, give them a construction as to place Oregon and Washington legislation within the exemption under the Act.

Plaintiff's argument that the Washington regulatory laws could only cover Washington contracts and not an Oregon contract, which was made to be performed in Washington, is tenuous in the extreme. Any reasonable construction of the Washington anti-compact law would cover insurance contracts executed in another state, but performed in Washington. The law would be meaningless if construed otherwise. To be constantly kept in mind is the fact that plaintiff claims relief under § 1 of the Sherman Act and, insofar as I can determine, makes no claim under § 7 of the Clayton Act, which was the basis of the decision in United States v. Chicago Title & Trust Co., 242 F.Supp. 56 (N.D.Ill.1965).

The cases are legend where the courts hold that the state legislation, although it differed from the Model Act and the Sherman Act, was sufficient. These cases include Professional & Business Mens Life Ins. Co. v. Bankers Life, supra; North Little Rock Trsp. Co., Inc. v. Casualty Reciprocal Exchange, 181 F.2d 174 (8th Cir. 1950), affirming 85 F. Supp. 961 (D.Ark.1949); Federal Trade Comm'n v. National Casualty Co., supra (Model Act), 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958).

On a complete assemblage of all of the facts and circumstances, I find

nothing which would point to a boycott. A summary judgment in favor of Foremost is proper on this cause.

### SIXTH CAUSE

It is my belief that ruling should be reserved on the legal issues raised on the motion for a summary judgment against the plaintiff on the sixth cause of action.

A proper order on the first and sixth causes and a summary judgment on the second cause in conformity herewith shall be prepared and presented forthwith.